[Civ. No. 12411. First Dist., Div. One. July 8, 1943.]

CHARLES M. MANNON, Plaintiff, v. ANNA PESULA et al., Defendants; ALLAN STANDISH et al., Appellants; YORKVILLE LUMBER COMPANY, LTD. (a Corporation), Respondent.

R. Clarence Ogden for Appellants.

Harry W. Falk, Jr., and Charles Kasch for Respondent.

PETERS, P. J.—Charles M. Mannon brought this action in interpleader to determine conflicting claims to the sum ·of $1,975.31, the proceeds from the sale by Mannon of certain sawmill machinery and equipment. The conflicting claimants, each of whom filed cross-complaints, are Yorkville Lumber Company, Ltd., in whose favor the trial court found, and H. B. Hickey and Allan Standish, the appellants. Hickey has since died and his executors have been substituted. Others were named as defendants but were either never served or have defaulted.

The facts are as follows: In 1932 C. J. Pesula and N. P. Burgess entered into a partnership for the purpose of cutting and manufacturing into lumber certain timber growing on lands then owned by Miles Standish. Miles Standish died and Allan Standish and H. B. Hickey became the owners of the timberland. In May of 1932 Standish and Hickey entered into a written agreement with Pesula, who was acting on behalf of the partnership, under which Pesula was to harvest timber on the Standish and Hickey lands and to manufacture it into lumber there. It was contemplated that

Pesula and Burgess would construct a sawmill on the premises. The agreement provided that from the proceeds of the sale of the lumber Standish and Hickey were to be paid $1.00 per thousand feet of lumber sold; Pesula was to receive $1.00 per thousand feet to amortize the cost of the sawmill; operating expenses were to be paid, the balance divided equally between the contracting parties.

Pesula and Burgess did not have sufficient capital to purchase and install the sawmill. The construction of the mill and the purchase of the required machinery were almost entirely financed through loans from the Savings Bank of Mendocino County. The first loan from the bank was secured in July of 1932. The bank was unwilling to lend the money without security. Standish and Hickey agreed to and did give the bank as security a deed to the timberland, intending it as a mortgage. This was in accordance with an oral arrangement between Pesula and Burgess, and Standish and Hickey. When Pesula and Burgess needed more money the bank was unwilling to make further loans without more security. In August, 1932, Hickey pledged with the bank his personal collateral of a value of $10,000 as additional security for the Pesula-Burgess loans. Further loans were made until in November, 1932, Pesula and Burgess owed the bank $9,000.

The payment of these loans was admittedly the primary obligation of Pesula and Burgess. A large portion of the money secured from the bank was used to install and build the sawmill, and to make payments thereon to the sellers. Burgess testified that some portion of the purchase price had been advanced by him and Pesula, but he was unable to remember or estimate the amount that had been so contributed. The only reasonable inference from the evidence is that the borrowed funds paid for the major portion of purchase price and installation of the machinery and equipment, the proceeds from the sale of which are the subject of the present action.

The construction of the sawmill was completed in November, 1932, and operations began. At about this time Pesula and Burgess organized a corporation, the respondent Yorkville Lumber Company, Ltd., to take over operations. It was intended that this corporation should issue 250 shares. A permit was secured from the Corporation Commissioner which

provided for the issue of 247 shares to be divided equally between Pesula and Burgess in exchange for a transfer by them of their cutting rights to the timber and interest in the machinery and equipment. The other three shares were to be issued for $100 per share. Certificates for one share each in the names of Pesula, Burgess and Mannon (plaintiff herein) were prepared and detached from the stock book, and thereafter retained in the law office of Mannon who had handled the incorporation. The three men constituted the board of directors and officers of the corporation. Mannon was also president of the bank that had made the loans above described. The $100 a share required by the permit was not paid for these three shares. What was done about the other 247 shares is not shown by the record. It is admitted that Pesula and Burgess at no time formally executed a transfer of the cutting rights to the timber or of their interest in the sawmill to the corporation. It is admitted by all here concerned, however, that after the corporation was organized it conducted operations on the lands, and both parties to this appeal discuss the rights of the parties as if Yorkville Lumber Company, Ltd., subsequent to its formation, owned the machinery in question. It is apparent that Pesula and Burgess were the beneficial owners of the corporation, and that the recovery by the Yorkville Company in the present action is, in effect, recovery by Pesula and Burgess.

In February, 1933, the Yorkville Company increased its loan from the bank to $12,000 for which the corporation executed two $6,000 notes, the old Pesula and Burgess notes being surrendered. Standish and Hickey had agreed with the bank that the deed, and the Hickey pledge of collateral, should be security for the indebtedness of the Yorkville Company to the bank.

In June of 1934 the Yorkville Company borrowed $5,000 from Standish, for which it gave Standish its promissory note. Thus, at this time, the land and timber of Standish and Hickey were mortgaged to secure the $12,000 indebtedness of the Yorkville Company to the bank. In addition, Hickey had pledged collateral of a value of $10,000 to secure that indebtedness, and Standish had loaned the company $5,000. Although the machinery and equipment had been largely, if not entirely, purchased and installed with these borrowed

funds, title thereto was in the Yorkville Company, and Standish and Hickey and the bank had no written evidence of any lien thereon for security.

In the fall of 1934 the Yorkville Company ceased operating the mill, having found the operation not profitable. Nothing had ever been paid to Standish and Hickey under the agreement whereby they were to receive $1.00 per thousand feet of lumber manufactured and sold. All sums received from the sale of the lumber were paid to the bank to be applied on the loan or were used in paying for operations. After operations ceased in 1934 some lumber was thereafter sold and the proceeds paid to the bank. In March of 1936 the Yorkville Company's debt to the bank had been reduced to $9,200.

Prior to March of 1936 Standish and Hickey incorporated under the name of Standish & Hickey, Ltd. and apparently conveyed title to the timberlands to this company. No facts concerning this incorporation appear in the record, but it is apparent that Standish and Hickey were the beneficial owners of that company, and that it may be treated as the alter ego of those two men, and it is so treated by the parties here involved.

On March 31, 1936, a written agreement was entered into between the Yorkville Company and Standish & Hickey, Ltd., as first parties, and R. E. Williams and H. B. Hickey, Jr., as second parties. H. B. Hickey, Jr. is the son of Hickey, who, with Standish, owned the land. This agreement is the basis of appellants' claim to the proceeds from the sale of the machinery. It recites that Standish & Hickey, Ltd. owns the timber on the lands in question subject to the cutting rights of the Yorkville Company, and that the last named company owns the cutting rights and the machinery located on the land, and that the Yorkville Company is indebted to the Savings Bank of Mendocino County. It provides that the first parties agree to sell and the second parties agree to buy the timber, sawmill, machinery, appliances, tools and accessories. The second parties agree to prosecute lumbering operations diligently and to pay the bank $3.00 for each thousand feet of lumber sold and shipped from the sawmill until 9,000,000 feet shall have been paid for, or all the timber manufactured and sold. If there are more than 9,000,000 feet, all footage over that figure is to be paid for at the rate of $1.00 per thousand feet. As to the disposition of the money paid to the bank the agreement provides:

"Said Savings Bank of Mendocino County shall apply all moneys received by it hereunder to the extinguishment of the debt owing to it by Yorkville Lumber Company, and the debt owing to Allan M. Standish by Yorkville Lumber Company and thereafter shall apply all moneys received hereunder as jointly directed by Yorkville Lumber Company, Ltd., and Standish & Hickey, Ltd."

It is then provided that "first parties [which includes Standish and Hickey as well as the Yorkville company] reserve title to all property covered by this contract" except that title to the lumber shall pass to second parties at the time of manufacture; that first parties agree that on the fulfillment of the contract they will execute a bill of sale to the personal property to second parties; that if second parties default, first parties shall be released from all obligations and second parties shall forfeit all right to the property, and all payments made by the second parties prior to such default shall be retained by the first parties as rent for the use of the premises and equipment and as compensation for the lumber. The agreement is signed by Standish & Hickey, Ltd., by H. B. Hickey, president, and A. M. Standish, Secretary; by Williams, and Hickey, Jr., and by the Yorkville Lumber Co., Ltd., by C. J. Pesula, President, and Charles M. Mannon, Secretary. Burgess did not approve this transaction, and did not sign the agreement.

Hickey, Jr. and Williams went into possession under this agreement and operated for some time. Pursuant to the agreement they paid to the bank several thousand dollars at the rate required in the agreement, which was applied by the bank to the loan due it. In May of 1937 Hickey, Jr. and Williams discontinued operations. The contract provided a formal means of default by which such default was to be "conclusively established." That means was not adopted by Hickey, Jr. and Williams. They simply ceased operations and moved off the premises. There can be no doubt but that they defaulted under the contract. They make no claim to any part of the proceeds from the sale of the equipment.

Early in June, 1937, a meeting was held at Mannon's office to determine what should be done. Mannon, Ogden, attorney for appellants, Pesula, Hickey, Sr., Hickey, Jr., one Peterson who represented Williams, and apparently Burgess, were present. At that time Hickey, Jr. and Williams (and the

Yorkville Company) owed the bank $7,240.54. Mannon and Allan Standish testified that all parties present agreed that the mill equipment should be sold by Mannon for the best price he could get, and that he should be the judge of the price. It was further agreed, according to Mannon, that the proceeds from the sale should be applied to the debts of the Yorkville Company, to the bank and to Standish. Burgess participated in the discussion and "didn't protest" against the above agreement, according to Mannon. This testimony of Mannon was corroborated by several of the others then present. Burgess testified he could not remember the meeting of June, 1937—that he may or may not have been there. He further testified that he had an informal understanding with Mannon that the latter could attempt to find a purchaser, but that no price was set, and Mannon was to consult the stockholders if he got a buyer. Thereafter, Mannon took charge of the property and sent several prospective purchasers to look it over. He was unable immediately to find a purchaser. In October, 1938, the bank refused to wait longer for its money. It paid the debt owing to it by the Yorkville Company by the sale of the Hickey collateral, and the notes of the Yorkville Company were marked "paid" and delivered to Hickey, Sr.

Mannon finally found a purchaser for the machinery and equipment in April of 1940, and it was sold to him for slightly less than $2,000. Before he completed the sale Mannon communicated with Pesula's attorney and with Standish. He was not sure whether he communicated with Hickey, Jr. and Williams. He had also written to Burgess enclosing a form of consent. He received no reply from Burgess. On April 18, 1940, he completed the sale. A dispute having arisen over who was entitled to the money, he instituted this suit in May, 1941.

The trial court found that Mannon had no authority to sell the machinery, and that the sale constituted a conversion. The finding of conversion is immaterial. No personal judgment was sought against Mannon. During the trial a stipulation, signed by the attorneys for appellants and respondent, was introduced in evidence which provided that Mannon could deposit the sums received by him with the clerk of the court and "be discharged from all liability to all defendants herein."

The finding that Mannon had no authority to sell, insofar as it affects the rights of any of the litigants now

before the court, is unsupported by the evidence. It is true that Burgess testified that he did not give his consent to the sale, but his personal consent was not required. Pesula and Mannon were two of the three directors of the Yorkville Company. They were also president and secretary of that company, and between them controlled a majority of the stock. They consented to the sale. Standish and Hickey, Sr., Williams and Hickey, Jr. also consented.

The fact that Burgess may or may not have been present at the June, 1937, meeting, and the fact that he did or did not consent to the sale, are false issues. The Yorkville Company was present in the persons of its president and secretary. They consented. It is true that the meeting was not conducted formally as a meeting of the Yorkville Company, nor were minutes kept, but two directors, the majority stockholders, and the president and secretary consented. Burgess had opposed the decision of Pesula and Mannon to have the Yorkville Company enter into the Hickey, Jr.-Williams contract, but it is not contended that such agreement was not binding on the Yorkville Company by reason of the concurrence of the two other directors.

There is another reason why Burgess' failure to consent is immaterial. This is a contest over the proceeds of the sale, with the Yorkville Company claiming on one hand, and Standish and Hickey claiming on the other. It is not an action for conversion nor to set aside the sale and recover the property. By seeking to recover the proceeds of the sale, the Yorkville Company has necessarily ratified that sale, even if it was unauthorized originally as to that company by reason of the absence of consent by Burgess. The classic example of ratification occurs where an agent has sold without authority, and the principal, instead of repudiating the sale, ratifies by suing for the purchase price. (See cases collected 1 Cal.Jur. p. 774, sec. 67.) The Yorkville Company, by laying claim to the proceeds of the sale, ratified the sale.

On the evidence above summarized the trial court found that the Yorkville Company on April 18, 1940, was the owner and entitled to possession of the sawmill, machinery and equipment, that Standish and Hickey had no interest therein, and that the Yorkville Company was entitled to the proceeds of the sale. It was the position of the trial court, and it is the position of the Yorkville Company on this appeal, that the situation is one where title to the machinery was in the York-

ville Company, and Standish and Hickey failed to protect themselves by taking a lien thereon.

The facts present a somewhat unusual situation. The sawmill equipment was purchased and installed almost entirely with funds of Standish and Hickey. Pesula and Burgess may have contributed an undetermined amount and may have contributed their time, but the major portion of the cost was paid for by Standish and Hickey. The loans from the bank and the $5,000 loan from Standish were obtained with the express understanding that the funds should be invested in the sawmill. In addition, the timber belonging to Standish and Hickey has been cut and they have not received one cent therefor. Standish and Hickey, as well as the Yorkville Company, hoped to share in the profits of the venture. The funds were so invested, but did not yield the contemplated profit. All that is left of the venture is the proceeds from the sale of the machinery. Standish was never repaid, and the bank loans were satisfied through the sale of the Hickey collateral. The result is that the funds and property of Standish and Hickey have purchased the machinery. ■ Even if the debts owed by the Yorkville Company to Standish and Hickey are barred by the statute of limitations, as respondent contends but did not prove, it would seem that under the circumstances the powers of equity are broad enough to create an equitable lien on the proceeds of the sale of the equipment. Those proceeds are far less than the total sum owing from the Yorkville Company to Standish and Hickey. ■ The equity courts look with favor upon equitable liens, and frequently such liens are employed to do justice and equity and to prevent unfair results. (*Carter* v. *Holt,* 28 Cal.App. 796 [154 P. 37]; *Hurley* v. *Atchison, Topeka & Santa Fe Ry.,* 213 U.S. 126 [29 S.Ct. 466, 53 L.Ed. 729]; *Red Bud Realty Co.* v. *South,* 96 Ark. 281 [131 S.W. 340]; *Pacific Ready Cut Homes* v. *Title I. & T. Co.,* 216 Cal. 447 [14 P.2d 510]; *City of Los Angeles* v. *Knapp,* 7 Cal.2d 168 [60 P.2d 127]; *Wagner* v. *Sariotti,* 56 Cal.App.2d 693 [133 P.2d 430].)

■ It is not necessary, however, to rely solely on the theory of an equitable lien in order to conclude that Standish and Hickey had an interest in the machinery. The contract of March 31, 1936, reasonably interpreted, gave them such an interest. That contract was between the Yorkville Company, Standish & Hickey, Ltd., which was the alter ego of Standish and Hickey, and Hickey, Jr. and Williams. This contract

describes the Yorkville Company as the owner of the machinery and cutting rights, and Standish & Hickey, Ltd. as the owner of the timber. It was primarily a conditional sales contract whereby the machinery, cutting rights, and timber were to be sold to Hickey, Jr. and Williams. But the contract also conferred certain important rights on Standish and Hickey. It provided that the buyers should pay to the bank $3.00 for each thousand feet of lumber sold. This payment was the consideration for timber, as well as for the machinery. The payments made to the bank under this contract were to be applied to the extinguishment of the Yorkville Company's debt to the bank (to which Hickey has been subrogated) and to the $5,000 debt owing by the Yorkville Company to Standish. It must be remembered that the Yorkville Company had completely ceased operations in 1934. Obviously, Standish and Hickey were unwilling that the buyers under the conditional sales contract should go into possession of their timber or of the machinery that their money had purchased unless some provision was made for their protection. The provisions that the buyers should pay the bank, and the bank should apply the money to the Yorkville Company's debts, were patently designed to give Standish and Hickey the protection they needed. To that extent it was an agreement between the Yorkville Company and Standish & Hickey, Ltd. whereby Standish and Hickey were to have security for their respective claims. It is a clear implication from the agreement that the bank (and therefore Hickey) and Standish were given an interest in the machinery and equipment for security purposes in the event that the buyers defaulted. When the buyers did default the interest which the bank (and therefore Hickey) and Standish had in the consideration to be paid by the buyers, attached to the property which had been the subject of that contract. When the contract is considered as a whole, and in the light of its background, this construction is reasonable and fair and in no way strained. It is fortified by the agreement made in Mannon's office in 1937, to the effect that he should sell the machinery and apply the proceeds to the Yorkville Company's debts to the bank and to Standish.

The situation is simply one where Standish and Hickey have entered into a contract with the Yorkville Company that the bank and they shall have an interest in the consideration to be paid by the conditional buyers for the lumber and machinery. By clear and reasonable implication the bank and

Standish and Hickey were given an interest in the property for security purposes which attached when the conditional buyers defaulted. When Mannon sold the property, Standish, and Hickey as successor to the bank's interests, were entitled to the proceeds of the sale in payment of their claims. It is unnecessary to determine the relative rights of Standish and Hickey because they have agreed that judgment may be entered in their favor without such division.

■ Appellants also contend that they were third party creditor beneficiaries of the 1936 contract. That is undoubtedly true. Williams and Hickey, Jr., instead of paying the Yorkville Company and Standish & Hickey, Ltd. for the lumber and machinery, were to pay the bank for the benefit of the bank and Standish, both being creditors of the Yorkville Company. The contract expressly provided that the bank (to whose rights Hickey has been subrogated) and Standish should be paid by Williams and Hickey, Jr. The contract was therefore expressly for their benefit and may be enforced by them. (Sec. 1559, Civ. Code.) But the contract was more than an ordinary third party creditor beneficiary contract. As already pointed out, there was a contract between Standish and Hickey and the Yorkville Company by which the latter expressly agreed, for the protection of the former, that the bank and Standish should have an interest for security purposes in the consideration to be paid by Hickey, Jr. and Williams, and by necessary implication agreed that such security interest should attach to the property in case of default by Hickey, Jr. and Williams.

■ The respondent argues that if Standish and Hickey were third party beneficiaries of the 1936 contract, the contracting parties have rescinded, which they may legally do, without the consent of the third party. Section 1559 of the Civil Code does provide that a third party beneficiary may enforce the contract "at any time before the parties thereto rescind it." It is argued that this section recognizes the right of the contracting parties to rescind prior to attempted enforcement by the creditor beneficiary. The theory of respondent is that when Hickey, Jr. and Williams failed to complete the contract there was, in effect, a rescission, which terminated the rights of the bank and Standish as third party creditor beneficiaries. If it be assumed, as contended by respondent, that the contracting parties may rescind any time before the creditor beneficiary brings suit, there was no rescission in

the instant case. A default by a conditional buyer and repossession by the seller is not a rescission. Moreover, for reasons already stated, this was not an ordinary creditor beneficiary contract. In addition, there was a contract between the Yorkville Company and Standish and Hickey that in the event of default the bank and Standish should have a security interest in the repossessed property. The default by Hickey, Jr. and Williams was the very event which brought this implied term of the contract into operation. Even a formal rescission would not affect that provision.

 Respondent also urges that under the allegations of their cross-complaint appellants may not recover except on the theory of pledge, and that such theory is unsound. The theory of the cross-complaint is that when the Yorkville Company ceased operations in 1934 Standish and Hickey went into possession of the land and equipment; that when the 1936 contract was made, Hickey, Jr. and Williams, besides being conditional buyers, were pledgeholders of the equipment as security for the debts of the Yorkville Company to the bank and Standish; that when Mannon went into possession in 1937 he did so as pledgeholder; that he sold the property as pledgeholder. This theory is quite artificial, and we agree with respondent that it was properly rejected by the trial court. It is not urged by appellants on this appeal. The fact that appellants pleaded an erroneous theory, however, does not bar them from recovery, if they also pleaded facts to support a proper theory of recovery. The answer and cross-complaint of the Yorkville Company alleges that that company owns and is entitled to the possession of the machinery and the proceeds from its sale. In their answer to this cross-complaint appellants deny these allegations. The contract of 1936 is pleaded as an exhibit to the pleading of appellants. Respondent was clearly informed that that contract formed the basis of appellants' claim. If, on any theory, that contract gives appellants any right to the proceeds of the sale, (as we have already held it did), appellants are entitled to urge that theory.

The judgment appealed from is reversed.

Knight, J., and Ward, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied September 1, 1943.