[Civ. No. 12754. First Dist., Div. Two. Apr. 3, 1945.]

Estate of FREDERICK W. HENSHAW, Deceased. GRIF-FITH HENSHAW, Respondent, v. STANLEY HEN-SHAW, Appellant.

Baldwin Robertson for Appellant.

Chickering & Gregory for Respondent.

NOURSE, P. J.—In a proceeding under section 1120 of the Probate Code the petitioner had a decree awarding him the sum of $26,000 out of the portion of a testamentary trust awarded to Stanley Henshaw, who is the appellant herein.

Frederick W. Henshaw died testate in June, 1929. By his will he left a large part of his estate in trust to his widow, the remainder, upon her death, to go to his three sons then surviving, Stanley, Frederick and Stuart. The widow deceased in April, 1943. The son Stuart died in May, 1939. Frederick, Stanley and Griffith, a nephew of the testator, were named as trustees under the will. Upon the death of the widow Frederick and Stanley, without joining their cotrustee, petitioned for an equal division of the trust. Griffith then appeared as a petitioner for distribution to him of the sum of $26,000 out of the portion to be allotted to Stanley. By agreement of the parties the original petition, insofar as it related to Frederick, was granted and one-half of the estate was duly distributed to him. The controversy between Stanley and Griffith then went to trial on the issues raised by Stanley—that the probate court was without jurisdiction to hear the controversy, that the contract upon which respondent relied was procured by fraud, and that the claim of respondent was founded upon a gambling debt.

The contract which is the basis of the controversy was executed October 21, 1940. It was signed by Stanley Henshaw,

Mooney Henshaw, his wife, and Griffith. For many years prior to that time Stanley had been in the habit of drawing on Griffith for large sums of money. Both were employed by the Riverside Cement Company and the practice had been to charge the advances made to Stanley on the books of the corporation to the account of Griffith. In 1937 Stanley owed Griffith because of these advances the sum of $46,000. In April of that year Griffith sought an adjustment of this indebtedness but had to write off $20,000 of the amount due and accept a promissory note from Stanley for the sum of $26,000. No payments of either principal or interest were made on this note. In June, 1940, Griffith wrote to Harry Isaacs, an attorney at law, and a mutual friend of the two parties, and requested him to endeavor to make some adjustment with Stanley. Negotiations were conducted with Stanley, his wife, and Isaacs until October 21, 1940, when the contract was executed by Stanley and his wife. The material portions of the contract after reciting the circumstances of the indebtedness of Stanley, the promissory note held by Griffith, and the ownership of thirteen shares of Hiram Tubbs Estate Company by Mrs. Mooney Henshaw, provided for the cancellation of the debt, the surrender of the note, and the transfer of the stock to Griffith, the income to go to Mooney for her life. It was then provided: "(2) Stanley Henshaw is the owner of an interest in the trust estate created by his father by will, such interest subject to being cut off by his death prior to the death of his father's widow. Stanley Henshaw agrees that in the event he should survive his father's widow and come into possession and enjoyment of his interest in the trust estate that he will pay Griffith Henshaw or his heirs from the proceeds of said trust estate the sum of twenty-six thousand dollars ($26,000.00), in which event Griffith Henshaw will reconvey to Mooney Henshaw his remainderman's interest in the thirteen (13) shares of Hiram Tubbs Estate Company."

The first question raised on the appeal touches the jurisdiction of the probate court. The respondent relies upon section 1120 of the Probate Code which reads in part:

"When a trust created by a will continues after distribution, the superior court shall not lose jurisdiction of the estate by final distribution, but shall retain jurisdiction for the purpose of determining to whom the property shall pass and

be delivered upon final or partial termination of the trust, to the extent that such determination is not concluded by the decree of distribution. . . .'' Attention is also directed to section 1240 of the Probate Code which authorizes an appeal from an order determining ''the persons to whom distribution should be made or trust property should pass.''

Before discussing the cases cited by the respective parties it is well to look at the legislation upon which the question rests. Section 1699 of the Code of Civil Procedure, upon which section 1120 of the Probate Code is based, provided that: ''Where any trust has been created by or under any will to continue after distribution, the superior court shall not lose jurisdiction of the estate by final distribution, but shall retain jurisdiction thereof *for the purpose of the settlement of accounts under the trust.*'' (Emphasis ours.) The section thus stood until the adoption of the Probate Code in 1931 when section 1120 conferred jurisdiction under the same circumstances to determine ''to whom the property shall pass and be delivered.'' At the same time, and by the same section, the power to retain jurisdiction for the purpose of settling the accounts of the trustee was made secondary to the power of determining to whom the property should pass.

In support of his argument that the court had no power to pass upon the rights of an assignee, a mortgagee, or a transferee, the appellant cites *Martinovich* v. *Marsicano,* 137 Cal. 354 [70 P. 459], decided in 1902; *Estate of Davis,* 136 Cal. 590 [69 P. 412], decided in 1902; *Estate of Crooks,* 125 Cal. 459 [58 P. 89], decided in 1899; *Estate of Howe,* 161 Cal. 152 [118 P. 515], decided in 1911; *McAdoo* v. *Sayre,* 145 Cal. 344 [78 P. 874], decided in 1904; and *Parr* v. *Reyman,* 215 Cal. 616 [12 P.2d 440], which was decided in June, 1932, after the Probate Code became effective, but upon a case made prior to the effective date and hence controlled by the old section because of the saving clause found in section 2 of the Probate Code.

Cases following the enactment of section 1120 and cited by appellant are not helpful to his cause. *Estate of Smith,* 4 Cal. App.2d 548 [41 P.2d 565]; *Estate of Smead,* 12 Cal.2d 20 [82 P.2d 182]; and *Estate of Marre,* 18 Cal.2d 184 [114 P.2d 586] all approve the direct statement found in the Smith case that: ''We believe the language employed in the present section of the Probate Code was intended to broaden the juris-

diction of the probate court so as to give that court jurisdiction over practically all controversies which might arise between the trustees and those claiming to be beneficiaries under the trust. This view is strengthened by a consideration of section 1240 of the Probate Code which provides for an appeal from an order settling an account of a trustee, from an order instructing a trustee, from an order 'determining heirship or the persons to whom distribution should be made or trust property should pass', and from an order refusing to make any of said orders.''

The Smith case was one to determine the legitimacy of an heir and a beneficiary under the testamentary trust. The Marre case was heard on the petition of a beneficiary to determine his right of payments under the trust. The Smead case really involved nothing more than the right to move for a new trial in proceedings brought under this section. *Texas Co.* v. *Bank of America,* 5 Cal.2d 35 [53 P.2d 127], did not involve this section and is applicable only in support of the general rule that probate proceedings are statutory and the jurisdiction of the court sitting in probate is limited. *Estate of McLellan,* 8 Cal.2d 49 [63 P.2d 1120], involved a dispute between the trustees and a beneficiary and has no application here. *Estate of Hubbell,* 121 Cal.App. 38 [8 P.2d 530], was decided after the Probate Code was enacted but was heard and determined on section 1699 of the Code of Civil Procedure. The court held that this section did not give the probate court jurisdiction to entertain a petition to terminate a testamentary trust. Finally, appellant cites *Estate of McLennan,* 29 Cal.App. 2d 666 [85 P.2d 499], where the trustee petitioned the probate court to determine the controversy over the identity of a beneficiary of the trust. A proceeding in equity was commenced in the superior court to determine the same controversy. Appellant states that the appellate court ruled that the superior court had concurrent jurisdiction with the probate court to decide the issue, but not the reverse. In this appellant is in error. The court held (p. 668) ''A probate court which has jurisdiction over a testamentary trust has concurrent jurisdiction with the superior court sitting as a court of equity to determine upon termination of the trust conflicting claims to the *corpus* of the trust. (*Dowdall* v. *Superior Court,* 183 Cal. 348, 353 [191 P. 685] ; *McCaughna* v. *Bilhorn,* 10 Cal. App.2d 674, 684 [52 P.2d 1025].)''

The case more nearly in point is *Thomas* v. *Superior Court,* 17 Cal.App.2d 40 [61 P.2d 496]. That was a proceeding in prohibition to restrain the superior court from hearing a petition for distribution of a testamentary trust which put in issue the extent of the interests of various assignees of the beneficiaries and conflicting claims among these assignees. In denying prohibition the appellate court said:

"The contention of the petitioner is that the superior court has no jurisdiction in such proceeding to determine such matters and he relies upon the case of *Kingsbury* v. *Ross,* 217 Cal. 484 [19 P.2d 784], and cases cited therein. Petitioner does not overlook section 1120 of the Probate Code, but he contends that the court does not have jurisdiction in spite of said section. The section reads as follows: . . . It will be observed that under said section the court does not lose jurisdiction of the trust estate by the final distribution of the probate estate, but that the superior court 'shall retain jurisdiction for the purpose of determining to whom the property shall pass and be delivered upon final or partial termination of the trust', etc. The petition for distribution is pending before the superior court as such and that court has jurisdiction, subject to the limitations of section 1120, to do the very things which the petitioner seeks to have this court prohibit."

The Thomas case has been cited with approval in *Estate of Rey,* 31 Cal.App.2d 648 [88 P.2d 718]; *Estate of Smead,* 12 Cal.2d 20 [82 P.2d 182]; and *Estate of Evans,* 62 Cal.App.2d 249 [144 P.2d 625], where at page 257, the court took the broad view that, under section 1120, "At any time subsequent to a final settlement of accounts, an heir, devisee or legatee or his assignee, grantee or successor in interest, may, after due notice, file an application for the distribution of the residue of an estate."

There is no lack of harmony in any of the cases following the enactment of the Probate Code that the court has jurisdiction under section 1120 to determine conflicting interests between rival beneficiaries and rival assignees. The Evans case goes further and adds grantees or successors in interest of a beneficiary. Hence, if the respondent herein can maintain his position that he is an assignee, or an equitable assignee, it cannot be doubted that he is one entitled to urge his petition in the probate proceedings. This postulate rests on the broad interpretation that the words of the section giving

power to determine "to whom the property shall pass and be delivered" mean that the probate court has power to determine conflicting claims to the present right of possession of the estate whether such claims are based upon inheritance, descent or contract.

This conclusion is strengthened by what was said in *Estate of Smith, supra,* that it was the purpose of the new section (1120) "to broaden the jurisdiction of the probate court." Since long prior to the enactment of the Probate Code the Supreme Court had held in *McAdoo* v. *Sayre,* 145 Cal. 344 [78 P. 874], that the probate court had jurisdiction under 1699 Code of Civil Procedure to determine a controversy between the trustee and a legatee under the will of the beneficiary of the trust the Legislature must have intended something more than a controversy between beneficiaries when it added the words to determine "to whom the property shall pass and be distributed." It is further strengthened by the language of the McAdoo case (p. 350) : "These methods of procedure in probate and in equity were obviously not adopted arbitrarily, but from the necessities of the case, and because there could be no complete accounting without establishing the right of the parties entitled to the property accounted for when it was passed from the control of the trustee. And it is difficult to perceive how any good end could be accomplished by arresting a proceeding of this character midway and relegating the parties to another action in the same court, or another court of concurrent jurisdiction, for a second determination of questions which the court in the proceeding had been compelled to determine; an action in which no new questions could well arise, and the only effect of which would be further delay and uncertainty, and possibly further complications arising from conflicting decisions in the different courts."

This view sustains some analogical consolation in a reference to the provisions of section 1020.1 of the Probate Code, which section was added in 1941. Therein it is provided that: "The Court before making distribution of any property of a decedent to *any assignee or transferee* of any heir, devisee or legatee or before making distribution to any person *other than* an heir, devisee, or legatee *pursuant to any agreement,* request or instructions of any heir . . . may [on motion of interested party or on its own motion] inquire into the consideration . . . and into the circumstances . . . and if it finds that . . . any such assignment, transfer, agreement . . . was obtained

by duress, fraud or undue influence it may refuse to make distribution pursuant thereto *except upon such terms as it deems just and equitable."* (Emphasis ours.) The Legislature by this section bestowed upon the probate court the very power and jurisdiction (in the case of final distribution) which the appellant herein contests. It would seem to be a logical deduction as to legislative "intent," that section 1020.1 was enacted upon the understanding that section 1120 meant what we have herein held because there is no sound reason why the court sitting in probate should have that power on final distribution and not upon distribution of a testamentary trust continuing after distribution of the estate proper.

Accepting the view that the probate court has jurisdiction to determine the extent of the interests of the assignees of beneficial interests in the trust estate we are confronted with the contention of the appellant herein that the contract of these parties is not an assignment of any part of his beneficial interest. Reference is made to the language of the contract: "will pay Griffith Henshaw or his heirs from the proceeds of said trust estate." ▆ Ordinarily a promise to pay an obligation out of the proceeds of a specific fund is not a present assignment of any portion of the fund. (6 C.J.S. 1105-6; 4 Am.Jur. 293; 16 Cal.Jur. 309.) But there is respectable authority to the contrary. Frequently our courts, in the effort to see that equity is done, have relaxed this rule and permitted evidence to show the intention of the parties beyond the limited words of the contract. It is uniformly held that a contract of this nature is open to construction and interpretation just like any other contract. ▆ Here the trial court found that the parties intended to make an assignment of appellant's beneficial interest, and to create an equitable lien thereon to the extent of respondent's claim. The evidence fully supported this finding and the only testimony to the contrary came from the appellant who discredited himself as a witness on so many occasions that the trial court could properly reject his testimony as a whole.

However, assuming that the direct evidence did not support this finding, the evidence of the circumstances surrounding the execution of the contract did fully support the finding that the parties by their contract created an equitable lien on appellant's share of the fund to the amount stated in the contract and that they intended an assignment of that por-

tion of the trust. Beside the direct testimony of the witnesses the evidence of the circumstances supports the inference and the finding that the parties contemplated that such was the legal effect of their act—the fact that respondent held appellant's unsecured promissory note for $26,000, which was past due, the fact that appellant's wife, Mooney Henshaw, was not obligated on this note and held all the stock of the Tubbs estate in her own name, the fact that appellant and his wife had marital difficulties which had caused separations, the fact that she thus contracted to transfer the remainderman interest as a part of the contract whereby appellant agreed to pay the obligation out of the trust estate, and the fact that respondent agreed to cancel the promissory note of appellant and look to payment out of the uncertain contingent interest of appellant in the trust estate. Since appellant would take nothing from the trust unless his mother predeceased him, all these circumstances lead inescapably to the inference that the parties intended something more than a mere promise to pay out of such a contingent expectancy when such promise was taken in consideration for an express promise to pay the existing note, which was enforceable out of any asset of appellant which might be found.

The accepted rule is that equitable liens are favored to do justice and prevent unfair results. (*Mannon* v. *Pesula,* 59 Cal.App.2d 597, 606 [139 P.2d 336]; *Wagner* v. *Sariotta,* 56 Cal.App.2d 693, 698 [133 P.2d 430].) When therefore after a full and impartial hearing the trial court finds upon the only reliable evidence presented that the parties intended to create an equitable assignment and an equitable lien such finding should not be disturbed.

The other grounds raised by appellant do not require extended discussion. In his answer to the petition for distribution the appellant directed his attack upon the contract of October 21, 1940, to the charge that it was procured by fraud and duress. His evidence wholly failed to prove any part of the charge. To the contrary, the evidence shows that he was given every opportunity and ample time to study the contract, took all the time he desired, and executed the contract without any pressure or influence on the part of respondent.

As a part of his claim of fraud in the execution of the contract appellant alleged that a part of the principal sum represented gambling debts from him to respondent. The trial court found that $4,000 of the principal sum represented

sums paid appellant by respondent to satisfy gambling debts incurred by appellant to third parties, and that the sum of $22,000 represented advances made by respondent for the use and benefit of appellant other than for gambling purposes. The evidence supported this finding—in fact, there was nothing in the way of competent evidence upon which a contrary finding could be based. This would require an affirmance of the judgment to the extent of $22,000, moneys advanced to appellant for his personal use and benefit. The effect of the finding covering the $4,000 item will be considered later.

■ Appellant attacks the rulings of the trial court under which a witness was permitted to testify from a memorandum made from the books of the Riverside Cement Company, of which company the respondent was a director and vice-president, and appellant was an employee and the witness the bookkeeper. The evidence, prior to the objection, had disclosed that for many years appellant had drawn on respondent personally for large amounts above his salary and that it had been the practice of respondent to make these advances out of the funds of the cement company and to charge them to respondent's account. The transcript which was prepared by the witness covered the advances made to appellant over the entire period from 1924 to December, 1940. In 1937 the parties had met and made a full statement and settlement of their account. It was then agreed that appellant owed respondent in excess of $46,000. Respondent settled by accepting appellant's promissory note for $26,000. This was the note that was cancelled under the contract of October, 1940. Under these circumstances we do not understand why respondent tendered the evidence objected to or why appellant made his objection. The evidence did not tend to prove any issue in the case. The appellant conceded that advances had been made to him over this period of time. The testimony of the bookkeeper tended to prove this to be true. But the issue was whether these advances were in payment of gambling debts. The testimony of the witness did not prove or disprove this. The burden was on appellant and he was satisfied to say that "a part" of the indebtedness was for gambling debts. Hence, even if the testimony was objectionable, it certainly was not prejudicial. To some extent it is a case under subdivision 5 of section 1855, Code of Civil Procedure, where the original "consists of numerous accounts" and the evidence sought is

only the "general result of the whole," and a case similar to *Johnstone* v. *Morris*, 210 Cal. 580, 588 [292 P. 970], where the Supreme Court said that the purpose of the code section was to prevent the time-wasting procedure of bringing a large number of books into court.

Finally the appellant argues that the trial court erred in denying him a trial by jury. The facts leading to the demand for a jury are these—the petition was filed on July 9, 1943, and set for hearing for July 29. The order to show cause was served on appellant on July 15. The answer of appellant was filed July 20. The matter was partially heard and on September 27 appellant's objections to the jurisdiction were overruled and the cause continued to October 11 for further hearing. It is stated by respondent, and not denied, that the appellant was present in court on September 27, that the matter was continued to October 11, on appellant's request, and again continued to January 10, 1944, by consent of the parties. On December 24, 1943, the demand for a jury was filed. There is no escape from the conclusion that this demand did not comply with the provisions of section 631 Code of Civil Procedure. That section in part provides that a trial by jury is waived by failing to demand a jury "at the time the cause is first set upon the trial calendar if it be set upon notice or stipulation, or within five days after notice of setting if it be set without notice or stipulation." Here the cause was "first set" for trial upon appellant's request, and, of course, he must be deemed to have notice of that fact.

We have reserved until this time a discussion of the finding of the trial court that $4,000 of the sum recovered represented moneys advanced to the appellant to enable him to pay gambling debts. Preliminarily it should be said that the evidence would have supported a finding that this fact was not proved. The advances were made in the summer of 1925. Appellant was a guest of respondent on a vacation trip where, during a two-weeks' sojourn, a group of men engaged daily in a game of what is commonly called "poker," which, by judicial decree, had been declared to be a game of chance, or gambling. (38 C.J.S. 41.) Both appellant and respondent participated in the game and both apparently played "on the cuff." In any event, after the vacation ended the two found that they were $9,100 in the red. Respondent paid the winner or winners and, by mutual agreement, the two partitioned their losses $4,000 to appellant, and $5,100 to respon-

dent. The $4,000 was thereupon entered on the books as an advance to appellant. Now the trial court found that of the sum of $26,000 the sum of $4,000 and no more represented sums paid by respondent at the special instance and request of appellant ''to satisfy gambling debts incurred by the said Stanley Henshaw to third parties.'' This presents the question whether moneys so advanced come within the rule that ''gambling debts'' are not recoverable.

■ The general rule is that moneys paid out at the request of the loser in discharge of a gambling debt may be recovered by the payor. (38 C.J.S. 98; *Corbin* v. *Wachhorst*, 73 Cal. 411 [15 P. 22]; *Moritz* v. *Lumbley*, 141 Miss. 453 [106 So. 642]; *Pohlman* v. *Bretz*, 20 Ohio App. 273 [153 N.E. 139].) The basic principle upon which gambling debts are held unenforceable is that the courts should not lend their aid to an illegal transaction. This is emphasized in *Kyne* v. *Kyne*, 16 Cal.2d 436, 438 [106 P.2d 620], where the Supreme Court said: ''This rule has been rigidly enforced in this state to deny any relief in the courts to parties seeking to recover either their stakes or their winnings under a wagering contract which is in violation of law, whether the party against whom the relief was sought was a party to the wager or a stakeholder for the parties to the wager.'' ■ The appellant does not question this rule and does not cite any authority to show error in the judgment. He is content to argue that ''a part'' of the judgment represented roulette chips received from respondent to enable appellant to engage in gambling games. The trial court found that this was not so and the evidence supports that finding. The transactions upon which appellant relies were said to have occurred some 10 or 15 years before the settlement which the parties made in 1937. It was a fair inference that the sum stated in appellant's promissory note of that date represented moneys advanced to appellant for other than gambling purposes. We find no reversible error in the record.

Judgment affirmed.

Goodell, J., and Dooling, J. pro tem., concurred.

A petition for a rehearing was denied May 3, 1945, and appellant's petition for a hearing by the Supreme Court was denied May 28, 1945.