Mary .E. PATRICK, Appellant,

v.

Dr. Jack D. SEDWICK, Appellee.

No. 314.

Supreme Court of Alaska.

April 21, 1964.

See also Alaska, 387 P.2d 294.

Robert A. Parrish, Fairbanks, for appellant.

Arthur D. Talbot, Anchorage, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

AREND, Justice.

The principal issue in this case may be stated as follows: Where a patient had a soft, feminine voice before undergoing a subtotal thyroidectomy but immediately thereafter was found to have permanent paralysis of the left vocal chord, is the inference that the physician who performed the operation may produce partial or even recurrent laryngeal nerve of the patient sufficient to establish a prima facie case of negligence, notwithstanding the fact that injuries of this type do occur in about one to five percent of the operations performed, regardless of how careful the surgeon may have been or what surgical technique he may have employed?

The plaintiff below, Mary Patrick, alleged in her complaint that the defendant, Dr. Jack D. Sedwick, while performing a subtotal thyroidectomy[1] upon her negligently severed certain of her nerve structures causing portions of the vocal chords and organs of her throat to become paralyzed so that she is unable to speak well and has lost two thirds of her breathing capacity. She also alleged that the operation was performed without her informed consent. The doctor denied the charges of negligence and absence of informed consent.

At the trial, which was to the court without a jury, the evidence revealed, in substance, that in April of 1957 the plaintiff was advised by a Dr. Sydnam to undergo a subtotal thyroidectomy. The operation was performed by the defendant, assisted by a Dr. Hume, on July 10, 1957. Up until the time of the operation, the plaintiff enjoyed a normal, active life, had a soft, clear voice and experienced no difficulty in breathing. Immediately upon awakening from the anesthetic given her for the operation, she discovered that she could hardly talk or breathe. This condition has not improved but has left her with a hoarse voice and shortness of breath.

It was established through expert medical testimony that plaintiff's left vocal chord was totally and permanently paralyzed and that it was sickle-shaped and atrophied, indicating that the recurrent laryngeal nerve[2] had been severed; that accidental injury to this nerve during surgery does occur in spite of the best precautions, because of the anatomical variations of the nerve and the types of diseases which occur in the thyroid gland; that it is the surgeon himself who makes the determination that he used every precaution; and that it is good practice for him to note in his operative report when the nerve cannot be found or is in an abnormal condition as where the nerve is scarred in by disease[3] or takes an irregular course through the portion of the thyroid gland which is to be removed.

A pathologist testified that he examined the excised portion of the plaintiff's thyroid gland and found it to be about three times normal size, that it exhibited a chronic inflammatory process, involving the whole gland, which is known as Hashimoto's disease, but that it contained no trace of the recurrent laryngeal nerve.

Dr. Milo H. Fritz, a specialist in otolaryngology and ophthamology testified as a witness for the defendant that, if the nerve is cut, the vocal chord cannot move. Even if the nerve is only crushed or pinched there may be transient loss or change in quality of the voice. A severe crushing of the nerve may result in a

1. A subtotal thyroidectomy is the surgical removal of just less than the total thyroid gland.

2. The recurrent laryngeal nerve is one of the most important branches of the vagus or pneumogastric nerve. It passes into the vocal chord on each side of the larynx or windpipe and lies beneath the thyroid gland. One of its principal functions is to work the vocal chords. Maloy, Legal Anatomy and Surgery, 145, 403 (2d ed. 1955).

3. The defendant testified that, if the recurrent laryngeal nerve is injured during a thyroidectomy, the paralysis of the vocal chord is immediate, whereas, if the nerve is being destroyed by disease, the paralysis comes on gradually.

temporary total paralysis of the nerve. The nerve may also be injured by disease or scar tissue, resulting in change and quality of the voice. Hoarseness in a patient immediately after a thyroidectomy would indicate that the recurrent laryngeal nerve was damaged in the operation. Postoperative formation of scar tissue (fibrosis) around the nerve or edema resulting from the operation severed or injured the left total dysfunction of the nerve, but the process would be gradual and the symptoms would be noticeable as they came on.

The defendant testified that he had no independent recollection of the operation he had performed upon the plaintiff.[4] The operative report, which he dictated the day after surgery and which appears as an exhibit in the record, did not refresh his memory and he could not identify it as being a transcript of his recollection. He could only say that the surgical procedures he employed in the plaintiff's case would have been those he routinely followed in his practice of excising the thyroid gland. One of those procedures would have been to visualize the recurrent laryngeal nerve in the operative area where it is most vulnerable, that is, where it comes in close proximity with the inferior thyroid artery.[5]

The defendant had no present recollection as to whether there was any unusual anatomical variation of the plaintiff's recurrent laryngeal nerve, and he did not subscribe to the idea that the nerve is ever incorporated in the gland, although he stated that it might become surrounded by a posterior growth from the gland. The operative report states that the recurrent laryngeal nerve was visualized on the right side and that the same procedure was followed on the left. It notes that there was symmetrical marked enlargement of both lobes of the thyroid gland, but it makes no mention of anything irregular in the appearance or course of the recurrent laryngeal nerve or that the nerve or the gland presented any problem in connection with the operation. The defendant expressed the opinion that surgical destruction of the nerve would be consistent with due care only because of disease in the thyroid gland making dissection difficult or because of anatomical variations of the nerve through the operative area. He stated that the Lahey paper[6] admits severance of the nerve in one percent of the uncomplicated and five percent of the complicated thyroidectomies.

In his "Memorandum Decision" the trial judge made the following findings pertinent to the issue stated at the commencement of this opinion: (1) that the plaintiff had a soft, clear voice before the operation but was having difficulty in breathing and speaking immediately after the operation; (2) that she suffered injury to the recurrent laryngeal nerve in the course of the operation performed upon her by the defendant doctor; (3) that, since the injury is one of the expectable hazards of thyroid surgery and does occur in a percentage of these cases despite reasonable precautions, he, the trial judge, could not make a finding that the probable cause of the injury was the defendant's negligence;[7] and (4) that the doctrine

4. Dr. Hume and Dr. Sydnam likewise had no present recollection of the plaintiff and her ailment other than what their records disclosed. This is fairly attributable to the fact that the trial was not held until four years after the plaintiff's operation.

5. It appears from the testimony of the defendant that the technique he employs of visualizing the recurrent laryngeal nerve is generally patterned after the so-called "Lahey technique." Some surgeons, on the other hand, make no attempt to visualize the nerve. This is known as the blind technique.

6. The Lahey paper appears to be a medical article from the Lahey Clinic, relating to thyroidectomies, and is contained in a book entitled "The Surgical Clinics of North America." The book is mentioned as an exhibit for identification in the record but was not introduced into evidence.

7. In commenting upon the inferences as to negligence which might or might not be drawn from the evidence in this case the trial judge stated:
"Now, the fact that the injury occurred in the course of the operation is not, I believe, an occurrence from which a lay-

of *res ipsa loquitur* is not applicable to this case because it cannot be said that the injury here would not have occurred without negligence.[8]

On appeal the plaintiff contends that the trial court erred in finding that the injury to her recurrent laryngeal nerve was as consistent with due care as with negligence in the performance of the thyroidectomy, and in failing to apply the doctrine of *res ipsa loquitur*. Either a specific negligent act was inferable from the fact that a healthy part of the body involved in the surgical procedure was damaged, she says, or conditions were present which made the doctrine applicable.

We do not consider it necessary to utilize the notion of *res ipsa loquitur* as a guide to the evaluation of the evidence in this case[9] because in our opinion the circumstances developed at the trial made out a prima facie case of negligence against the defendant. As shown by the evidence above related the plaintiff went into the operation with a soft, clear voice, indicating a healthy vocal chord and recurrent laryn-

geal nerve. Immediately after the operation she experienced difficulty in breathing and her voice was hoarse. These conditions have persisted. Postoperative examinations disclosed that her left vocal chord was totally and permanently paralyzed. One expert testified that the hoarseness indicated that there was damage to the nerve at the time of the operation, and another expert stated that in all the permanent paralyses of vocal chords which he had ever seen, the nerve had been actually severed.

This was as far as the plaintiff could go in proving her case. To show more in the way of negligence she would have had to be a conscious observer of all that transpired in the operation or be able to penetrate the mind and memory of the defendant as to what he saw and did in the operative area. This was beyond her power to do. We find that she did enough under the circumstances to make out a prima facie case of negligence.

The defendant says that the nerve may have been injured by one or more of several harmful forces. He says that it may have

man can draw an inference of negligence, and according to the expert medical testimony, such an injury occurs in a percentage of cases despite reasonable precaution. If I were informed that out of every 100 thyroidectomies there would result a certain percentage involving injury to the nerve, of which a certain number of these occurred through the negligence of the surgeon, and a certain number occurred in spite of the best precautions, then I might balance these factors and determine the probability of negligence. But I have before me no such information. I am told nothing more than out of so many thyroidectomies a certain percentage will result in injury to the nerve despite precautions. I cannot say therefor, under these circumstances, that the defendant was probably negligent. The inference that the injury to the nerve occurred in spite of precautions is equally strong as the inference that the injury to the nerve occurred through negligence. Hence, I cannot make a finding that the probable cause of plaintiff's injury was defendant's negligence."

3. The plaintiff had urged the trial court to apply the doctrine of *res ipsa loquitur* as a matter of law in this case. Tradi-

tionally the doctrine has been applied only when (1) the accident is one which ordinarily does not occur in the absence of someone's negligence; (2) the agency or instrumentality is within the exclusive control of the defendant; (3) the injurious condition or occurrence was not due to any voluntary action or contribution on the part of the plaintiff. See Prosser, Torts § 42, at 201 (2d ed. 1955); 2 Harper and James, Torts § 19.5 at 1081 (1956). The plaintiff in the instant case failed to meet the first requirement for the application of the doctrine, unless one were to reason that a one to five percent of inevitable injuries to the recurrent laryngeal nerve in thyroidectomies is too small a percentage to take such accidents out of the category of accidents which ordinarily do not occur in the absence of someone's negligence.

9. For a discussion of the problems involved in the application of the doctrine of *res ipsa loquitur* and instances of misconstruction, see Prosser, *Res Ipsa Loquitur* in California, 37 Calif.L.Rev. 183 (1949); Rubsamen, *Res Ipsa Loquitur* in California Medical Practice—Expansion of the Doctrine to the Bursting Point, 14 Stan.L.Rev. 251 (1962).

been several, traumatized by handling, accidentally enclosed in a suture, compressed by postoperative swelling, strangled by postoperative scar tissue, or destroyed by progressive disease of the thyroid gland.[10] The pathologist's report states that the plaintiff's thyroid gland was three times normal size. This fact, the defendant argues, makes it quite likely that the nerve was involved with the gland. If there was such involvement and it made the surgery difficult, it seems reasonable to believe that the defendant would have mentioned the fact in the postoperative report.

█ We hold that it was incumbent upon the appellee surgeon to have described accurately and fully in his report of the operation everything of consequence that he did and which his trained eye observed during the operation. To have maximum probative force the report should have been dictated immediately after the operation. If these requirements had been met the report would have been more likely to have refreshed his recollection and have supplied sufficient facts to have permitted expert witnesses to testify on the question of negligence.

Instead the report was not dictated until the day following the operation and after appellee had visited and observed appellant at the hospital. The "findings" of the report merely state: "There was symmetrical marked enlargement of both lobes of the thyroid gland. There were no hard nodules present in the gland. Gland was meaty and very vascular." The "operation" portion of the report consists of nondescriptive sentences which simply state the ultimate facts connected with each step of the operation commencing with the incision. No mention is made of any problems, variations or difficulties encountered during the operation.

After the operative steps through the dissection of the right lobe of the thyroid gland had been mentioned, the report then states:

"On the left the same procedure was done * * *."

We know from the pathologist's report that the thyroid gland was enlarged to three times its normal size. It is difficult to believe that this circumstance did not create particular operating difficulties worth mentioning in the report. The report does state that the recurrent laryngeal nerve was visualized while operating on the right side of the gland. No particular mention is made of any of the operative steps employed on the left side. It could be assumed that the nerve was also visualized on the left side and that the operation was completed with faultless technique. The report does not say so, but the court is asked to so assume. The defense is then rounded off by relying on statistics which hold that a small percentage of these operations result in damage to the laryngeal nerve in spite of all precautions.

The objection to this defense is that we know from expert medical testimony that, even though the nerve may have been visualized on the left side, it was also either severed or otherwise damaged. In attempting to determine whether the severance or damage was the result of negligence the court was faced with a total lack of recollection by the appellee and his medical assistant and an operation report which merely described the operation on the left side as being the same as that done on the right side. Even if the Lahey statistics are accepted and it is assumed that severance or damage can happen without negligence in a small percentage of cases, it does not follow that in every such instance the surgeon is totally unaware of the facts surrounding the cause, even though he may not have been able to prevent it.

Appellee was the only person who could have prepared a full and accurate report of what was observed and done through the incision in appellant's throat. We hold that he was obligated to his client to prepare

10. Injury to the nerve from postoperative swelling or scar tissue or destruction by disease of the gland is not immediate but comes on gradually, as was brought out at the trial.

such a report and that he failed to discharge his duty in this respect. We shall not permit the absence of personal recollection or of recorded facts to serve as a defense under the circumstances of this case.

■ There remain to be considered three other issues raised by the plaintiff, the first of which is that the court erred in failing to find that the thyroidectomy was performed without her informed consent. Dr. Sydnam in advising surgery told the plaintiff that it was nothing more than a tonsillectomy and said that it would be arranged to have Dr. Sedwick visit her at the hospital on the evening before the operation. The visit was never made and the only opportunity the plaintiff ever had to converse with Dr. Sedwick was for a few minutes in the operating room just prior to surgery, at which time he said, "[H]ello, Mrs. Patrick, I am Dr. Sedwick." The plaintiff then asked him if there was any danger of her goiter returning and he replied that there was no guarantee against it.

In her brief the plaintiff states that if she had been informed of the risk of losing her voice she might not have consented to the operation. There is no evidence in the record that the plaintiff would have declined the operation if the defendant had informed her of the risk involved, that the nerve might be severed and her voice affected.

Dr. Fritz testified that it was his practice not to unduly alarm his patient when discussing proposed surgical procedures with him, but if the patient asked about his chances, that he would explain truthfully to the patient as best he could, and also speak to the family when in his judgment the patient's condition warranted. Dr. Sydnam followed no general rule as to all patients, but placed the nature of the discussion of risks upon the stability and comprehension of the particular patient, with the exception

that any specific inquiries of the patient should be answered. The doctor's chart notes indicated that the plaintiff was a nervous and apprehensive person.

The defendant followed a practice of seeing patients before surgery. Whether information concerning serious risks of surgery should be given or withheld would depend upon the disposition and psychological makeup of the patient. He felt that it was for the patient to determine what should be done with his body, rather than for the physician to make the decision. His determination in this case, he said, had been based upon his talks about the patient with Dr. Sydnam, the referring physician.

There is good law in support of the argument made by the defendant in his brief that the doctor need not inform the patient of all the hazards involved in an operation; that doctors frequently tailor the extent of their preoperative warnings to the particular patient to avoid the unnecessary anxiety and apprehension which such appraisal might arouse in the mind of the patient.[11] In the light of the evidence in this case and the law bearing on the question of informed consent, we cannot say that the failure of the trial court to make a finding of lack of informed consent was clearly erroneous.[12]

■ The plaintiff next alleges that the trial court erred in admitting into evidence, over objection, Dr. Sedwick's operative report. The basis for the objection seems to be that the report was self serving, because it was not made immediately after the operation but a day later and possibly after the first postoperative conversation between the parties. In this conversation, which took place between eight and ten o'clock on the morning of the day following the operation the defendant inquired of the plaintiff whether she had ever spoken in a normal voice since the operation. She informed

11. Roberts v. Wood, 206 F.Supp. 579, 583 (S.D.Ala.1962) ; Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees, 154 Cal. App.2d 560, 317 P.2d 170, 181 (1957) ; DiFilippo v. Preston, 53 Del. 539, 3 Storey 539, 173 A.2d 333, 339 (1961).

12. One of the provisions of Civ.R. 52(a) is that findings of fact shall not be set aside unless clearly erroneous and that due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

him that she had not. This, says the plaintiff, gave Dr. Sedwick a motive for falsifying the operative facts in the report.

We can find no reason for holding that the admission of this report was prejudicial to the plaintiff. There was no jury to mislead and the plaintiff does not direct our attention to anything in the report itself that was prejudicial.

The memorandum of decision illustrates the abundance of caution with which the trial judge received and considered the report:

> After completing the operation, Dr. Sedwick dictated an operative report. These reports are customarily kept by the hospital. While these reports are required to be made promptly after the operation, there are times when several days pass between the time of the operation and the time the report is prepared. For this reason, the reports do not possess the reliability they might have. It is suggested by Louisell & Williams that careless habits of record keeping should be viewed as badges of suspicion respecting the accuracy of entries. See Trial of Medical Malpractice Cases, § 7.10. In this case the report (Defendant's Exhibit 'H') was dictated by Dr. Sedwick on the 11th of July, 1957. At that time he also signed at the place indicated on the bottom of the page. The report was subsequently typed in from the notes taken on dictation. According to the report, the recurrent laryngeal nerve was visualized. As I have indicated, I have not found this report as absolutely reliable, but I feel that it is entitled to some weight."

As a final point, the plaintiff charges that she was denied her constitutional right to a trial by jury. The first time that the plaintiff requested a jury trial in this case seems to have been at the pretrial conference. This conference was held off the record and apparently not until many months after the last pleading had been served. To make matters worse the parties are not in agreement on what occurred at the conference.

Article I, section 16 of the Alaska Constitution provides that "[i]n civil cases where the amount in controversy exceeds two hundred fifty dollars, the right of trial by a jury of twelve is preserved to the same extent as it existed at common law." By certain provisions of Civ.R. 38, this right to trial by jury has been regulated in the following manner:

> "(b) Demand. Any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue. Such demand shall be made in a separate written document signed by the party making the demand or by his attorney. * * *

> "(d) Waiver. The failure of a party to serve a demand as required by this rule and to file it as required by Rule 5(d) constitutes a waiver by him of trial by jury. A demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties."

■ Under the quoted provisions of the rule, the plaintiff would have been denied her constitutional right to trial by jury only if she failed to proceed in accordance with the rule. That is exactly what occurred in this case: she failed to file, within ten days after service of the last pleading, a written demand for trial by jury, as required by the rule. In fact, the record does not reveal that she ever filed the requisite written demand.

■ The provisions quoted from the rule are not unconstitutional unless they amount to an unreasonable regulation of the manner of exercising the right to trial by jury in civil cases. Both the United States Supreme Court and state appellate courts have decided that provisions such as those contained in Civ.R. 38(b) and (d) are

constitutional.[13] We are in accord with those decisions.[14]

■ We do have another rule of procedure in this state, Civ.R. 39(b), which provides that, notwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court in its discretion upon motion may order a trial by jury of any or all issues. No formal written motion grounded on this rule was ever interposed by the plaintiff. Her counsel waited until the day set for the trial to commence and then made what the trial court may have taken for an oral demand for a jury trial. This demand was denied. Counsel advances no reason why the denial of his motion was an abuse of judicial discretion other than to say that this case was peculiarly suited for a jury trial because of the many factual issues involved and because strict adherence to Rule 38 will work an injustice. We find no abuse of discretion.

The finding and judgment as to the nonliability of the defendant are set aside, and the cause is remanded to the lower court with directions to enter findings for the plaintiff on the issue of liability and then to proceed to determine the damage issue.

Reversed.

13. United States v. Moore, 340 U.S. 616, 71 S.Ct. 524, 95 L.Ed. 582, 586 (1951); Tomlin v. Pope & Talbot, Inc., 282 F.2d 447 (9th Cir. 1960); Moran v. Jones, 75 Ariz. 175, 253 P.2d 891, 893 (1953); In re Henshaw's Estate, 68 Cal.App.2d 627, 157 P.2d 390, 395 (1945); Bigler v. Richards, Colo., 377 P.2d 552, 555 (1963); Hoye v. Century Builders, 52 Wash.2d 830, 329 P.2d 474 (1958).

14. For Professor Moore's discussion on the constitutionality of Rule 38(d) of the Federal Rules of Procedure, which is identical with our Civ.R. 38(d), see 5 Moore, Federal Practice, para. 38.43 (2d ed. 1951).