[S. F. No. 17704.   In Bank.   Sept. 28, 1949.]

Estate of MATTIE G. STANLEY, Deceased. MILLEDGE F. STANLEY, as Administrator, etc., Appellant, v. JUANITA G. CLARKE, Respondent.

Edward D. Mabson for Appellant.

Richard M. Lyman, Jr., Leo A. Sullivan and Andrew P. Costelli for Respondent.

CARTER, J.—This is an appeal by Milledge Stanley from a decree of distribution in the estate of Mattie G. Stanley, the deceased wife of Milledge Stanley, in which certain personal property was divided equally between Stanley and Juanita Clarke, the daughter of Mattie by a previous marriage. A parcel of real property in Oakland, together with the furnishings in the house thereon, was ordered distributed to Juanita, subject to a life estate in Stanley.

The main dispute concerns a written agreement designated a ''Consent to Distribution'' between appellant, Stanley, and Juanita, in which it is provided that the property be divided as was done in the decree of distribution, the court finding the agreement valid and enforceable. Stanley contends that he was induced to sign it by reason of the failure on the part of Mr. Lyman, the attorney drafting the instrument, to enlighten him properly as to his rights in his wife's estate and misrepresentations by Mr. Lyman. It is also urged that the real property was the community property of Stanley and Mattie, or that it was held in trust by her for him, as a resulting trustee, on the basis that he supplied the purchase money. The last mentioned contentions become unimportant in view of the result reached herein that the court was justified in finding the agreement valid and enforceable, because that agreement settled and determined all of the rights of Stanley and Juanita to the estate property regardless of its character.

Though there is a conflict in the evidence on some points, viewing it most favorably to support the probate court's finding, the following appears: Mattie, whose maiden name was Gibbons, married Columbus Mariner in 1915 and they lived together as husband and wife until shortly before 1927 when Mariner obtained a divorce from Mattie in Arizona. In 1922, Mattie purchased the real property in question on a time payment basis, taking a deed to it in her maiden name. Stanley claims he supplied the purchase price to Mattie and that it was agreed between them that they would be mar-

ried and the property would be community. There is a conflict in the evidence on this point due to the fact that in 1935, in a divorce complaint by Stanley against Mattie, he alleged that the parties had no community property, and in a property settlement agreement executed by him, it is recited that there was no community property and that he waived any claim to the real property and furniture here in question. An interlocutory decree of divorce was granted to Mattie on her cross-complaint, and the settlement agreement was made a part of it. No final decree was entered and it appears the parties resumed marital relations. However, those matters are not of particular importance. Mattie died in 1943. Stanley and Juanita visited the office of Mr. Lyman intending to see Mr. Sullivan, who was in the same office, but as he was absent, they consulted Lyman. Although Juanita knew Sullivan, she did not know Lyman. It is at that conference that the arrangements were made for the ''Consent to Distribution'' agreement, and Lyman was retained to represent the estate with Stanley acting as the administrator. It is at this conference that it is claimed that Stanley was improperly induced to execute the agreement. Accepting Lyman's version of the events, as it is evident was done by the trial court, we find he testified: ''Mr. Stanley, . . . came into my office with Juanita Clarke, . . . Mr. Stanley asked me to represent him in the matter of the probate of the estate of his wife, Mattie G. Stanley, . . . I was then given a deed to this piece of property, the main subject of this controversy . . . and several bank books. It appeared that . . . Mattie G. Stanley had in her lifetime used several aliases, . . . as being Mattie G. Stanley, Mattie Gibbons, Mattie Gibbons Mariner and Mattie G. Stanley. This deed, when shown to me, I showed Mr. Stanley and called his attention to the fact that the deed was made in 1922 and asked him if it were separate or community property. *He stated to me that it was separate property, that he had no interest in it.* I thereupon told him and Mrs. Clarke that under Section 221 of the Probate Code of the State of California, it being separate property and there being a surviving husband and one child, *that they had an equal interest in the property.* Mr. Stanley had told me he had lived there for a number of years. Mrs. Clarke said, 'I have no desire to take the home from this man.' I thereupon told them the best way to work out the proposition was that Mrs. Clarke was to be given the property on distribution with a life estate reserved to Mr. Stanley so he might live there the remainder of his life,

without the necessity of paying any rent to anybody. *That, Mr. Stanley felt, was what he wanted, and so expressed himself.* The alternative way was also discussed, that these two people, having an undivided equal right to this property, it should be sold before distribution. Neither Mr. Stanley or Mrs. Clarke wanted that to happen. Mr. Stanley stated to me on not only one but many occasions he was well satisfied in being permitted to remain in this property during the rest of his lifetime, . . . On this occasion, in addition to the manner in which these two people, Mrs. Clarke and Mr. Stanley, expressing their desires that the property should be distributed in the manner I have stated, it was felt that there should be an agreement drawn up between them, providing for such distribution and further a discussion arose as to the right of Mr. Stanley to use the furniture and furnishings in this property which were left by Mrs. Stanley. It was discussed at that time, but no notation was made in the agreement until they came to my office on the second occasion. They thereupon discussed it further and it was agreed between them that in addition to Mrs. Clarke being distributed the estate and reserving a life estate in the real property, that Mr. Stanley should have a life estate in the furniture and furnishings. Interlineations made above line 28 'and furniture and furnishings thereon' were made in my handwriting as also the interlineations made above line 6 on the second page thereof and above line 18 on the second page thereof—and by 'thereof' I refer to the consent of distribution . . . After these interlineations were made at my request and in my presence and likewise in the presence of each other, Mr. Stanley and Mrs. Clarke initialed the interlineations . . . A further discussion was had as to how certain of the moneys standing in the bank account, the War Bonds—three War Bonds in the estate— were to be distributed to Mr. Stanley, that was agreed upon, the $100 War Bond to be distributed share and share alike to Milledge F. Stanley and Juanita Garcia Clarke. Then there was a question of $100 which was owed, or agreed to be paid, as my memory recalls, to a man by the name of Albert Gibbons, and both Mrs. Clarke and Mr. Stanley agreed to contribute $50 each to establish a savings account for this man who, I believe, lived out of the State of California. Milledge F. Stanley, the administrator to be appointed, it being understood he was by this instrument waiving any right to any fees as administrator of the estate. When these two people came into my office on the 2d occasion, which was on or about

Columbus Day, they were shown this 'consent to distribution' to which I have referred. Each was given a copy. Each was given an opportunity to read the instrument presented to them. I asked both Mrs. Clarke and Mr. Stanley to ask me any questions, if there was any doubt in their minds what was meant. It is true several questions arose, and the interlineations were made by me to take care of these matters over which there was any question or dispute as between the parties before they signed. Mr. Stanley did sign this agreement on or about the 12th or 13th of October, 1945, expressed his satisfaction with it, and it was not until sometime in the latter part of January, that he expressed any dissatisfaction with the agreement or with me as his attorney. . . . the following January after this agreement was signed, I prepared a will for Mr. Stanley which he has presently in his possession, unless he has destroyed it. After Mrs. Clarke's return to California, Mr. Stanley again came into my office with Mrs. Clarke and he expressed some dissatisfaction as to this agreement that he had made, and Mrs. Clarke said 'All right, I will do this: we will divide the furniture, and I will give you $1000 for your interest in the property.' Mr. Stanley verbally agreed to do that, and an inventory was taken by Mrs. Clarke and brought to my office, but that agreement was never at any time consummated . . . '' [Emphasis added.]

[On cross-examination]: "Q. Now, Mr. Lyman, did you make any inquiry with respect to the household furniture, as to when and under what circumstances it was to be purchased? . . . A. Only to this extent: *both* Mrs. Clarke and *Mr. Stanley* informed me *Mrs. Stanley had lived there and purchased furniture long before she married Mr. Stanley,* and when it came to the confirmation of this agreement, Mrs. Clarke said, 'I don't want to raise any dispute as to your right to use that furniture, and we will leave it this way: you will have a life interest in it, and you may have the use of it as long as you live.' [Emphasis added.] Q. Now, did you there and then ask Mr. Stanley whether it was community or separate property—did you make any inquiry of him, as to the manner of its acquisition or the circumstances under which it was acquired? A. The only conversation I can recall that might relate to the purchase or acquisition, I showed Mr. Stanley this deed dated 1922. Mr. Stanley said, 'I don't claim any interest in that property.' Q. That was the extent of the conversation with respect to that? A. He never made any claim. Q. Was that the extent of the conversation?

A. That is as far as I can recall anything about this acquisition by either party at any time. Q. I believe you testified on your direct examination that you stated to these people at the time of this conversation that the property, the real property, upon distribution would have to be sold? A. No, I said unless they could agree upon a division of the property or upon some other method of distribution it would have to be sold and equally divided between them. Q. Mr. Lyman, isn't it correct that if it were separate property and there were two heirs upon distribution the Court would distribute an undivided one half interest to each of the two heirs? A. That is true, but they understood that would not get them anywhere. Q. The fact of the matter is, it could be distributed in that manner without being sold or divided in any other manner—— A. (Interrupting) I even went further, but——Q. Isn't that true? A. That is true—as I went on and told these people, in the event it were distributed in the fashion, an action in partition might be necessary, which would involve additional expense, and it was better to arrive at an arrangement between them as to what would best be done. Q. Did you explain to Mr. Stanley as to what constitutes community property and the various circumstances under which community interest may be created? A. Yes, Mr. Dayton, I called the attention of Mr. Stanley to the date of this deed in 1922, and asked the date of his marriage. I said, 'This property was acquired by your wife a long time before the marriage,' and he said 'yes'. I asked, 'Have you any interest in the property, Mr. Stanley?', and he said 'No'. I said, 'That being the case, it is separate property, and you and Mrs. Stanley's daughter are entitled to an undivided one-half interest in that property each inasmuch as there are no other heirs.' '' Juanita corroborated the foregoing in substantial particulars. On the other hand, Stanley testified that he did not understand the agreement, that he did not read it, that the interlineations were not initialed by him, that he was instructed by Lyman to sign although he did not want to, that he did not understand the meaning of community property rights, and the like. Particular point is made of testimony that he signed the agreement against his will, induced by Lyman's promise that another one would be made out, but that, as we have seen, is contradicted by Lyman's testimony, and the other purported agreement was made much later at a time when Stanley became dissatisfied, and it was oral and was never consummated. We have nothing more than a conflict in the evidence which was resolved in

favor of Juanita that there was no basis for invalidating the agreement.

Stanley argues at length that Lyman was his attorney when the consent agreement was drawn (he acted as attorney for Stanley as administrator of the estate until he was substituted out in 1945) ; that as such, Lyman was derelict in his duty in not inquiring more fully into the character of the property of the estate ; and that thus Stanley was trapped into signing the agreement in ignorance of his rights. Even assuming that to be so, he cites no authority for the proposition that a person may avoid a contract with a third person where he is induced to enter into it by reason of the failure on the part of his attorney to fully disclose the extent and character of his rights and the effect of the agreement, and we find none. But it is not necessary to decide that question because the trial court had adequate basis for its implied conclusion that there was no such misconduct on Lyman's part. Juanita did not know Lyman and had never seen him before. The situation was a common one where two persons consult counsel. They were both Mattie's heirs and, she having died, the estate had to be probated and that undoubtedly was the main purpose of the call at Lyman's office. From his testimony it is clear that he had no reason to probe further into the character of the property. The parties brought a deed to the property with them that was dated over six years prior to the marriage of Stanley and Mattie. Stanley said he had no interest in the property, which did not involve any ascertainment on his part as to the intricacies of community property law. That is substantially the same position he took in the divorce action in 1935 where he had the aid of his own attorney (not Lyman). He there said the property was not community and presumably had been fully advised concerning his rights. He executed the settlement agreement waiving any claim he might have to the property. Juanita and Stanley were in full agreement as to the real property and the furniture was taken care of separately. He was fully satisfied with the consent to distribution agreement when it was made.

It is suggested that Lyman should not have represented Juanita in this proceeding since he had acted in the drafting of the agreement and as attorney for the estate ; that thereby he used information obtained from Stanley while he was his attorney. We express no opinion on that subject for it is manifestly immaterial in this case.

The determination of the validity and enforceability of the agreement was made by the superior court sitting as a probate court, and it is asserted that as such it lacked jurisdiction of the matter. Prior to the enactment of section 1020.1 of the Probate Code, and its predecessor section 530.1 of the same code, it had been repeatedly held that a probate court had no jurisdiction to pass upon the validity and effectiveness of an assignment or transfer of an interest in an estate made between heirs or legatees, or between heirs or legatees and strangers. (*McGee* v. *Allen,* 7 Cal.2d 468 [60 P.2d 1026]; see cases cited 11B Cal.Jur. 799-801, and 10-Yr. Supp.; 11A Cal.Jur. 99, and 10-Yr. Supp.). Section 1020.1 provides in part: ''The court [a superior court sitting in probate] before making distribution of any property of a decedent to any assignee or transferee of any heir, devisee or legatee or before making distribution to any person other than an heir, devisee, or legatee pursuant to any agreement, request or instructions of any heir, devisee or legatee or of any attorney-in-fact of any heir, devisee or legatee may on the motion of any person interested in the estate or on the motion of the public administrator or on its own motion inquire into the consideration for such assignment, transfer, agreement, request or instructions and into the amount of any fees, charges, or consideration paid or agreed to be paid by the heir, devisee or legatee and into the circumstances surrounding the execution of such assignment, transfer, agreement, request or instructions and if it finds that the fees, charges or consideration paid by any such heir, devisee or legatee is grossly unreasonable or that any such assignment, transfer, agreement, request or instructions was obtained by duress, fraud or undue influence it may refuse to make distribution pursuant thereto except upon such terms as it deems just and equitable. . . .'' Under that statute it is clear that the validity of the consent to distribution agreement between heirs could be tested by the probate court and if it was found invalid, a distribution would not be ordered in accordance with its terms. It is said in *Estate of Butler,* 29 Cal.2d 644, 648 [177 P.2d 16, 171 A.L.R. 343] : '' . . . the section [1020.1] indicates simply the purpose of the Legislature to give to the probate court, having but special and restricted jurisdiction as prescribed by law, 'some control, at least for the purpose of distribution, over agreements providing compensation for services of so-called ''heir-hunters.'' ' . . . *Prior* to the enactment of section 1020.1 and its forerunner, section 530.1 of the Probate Code, the probate court did not have the

power to determine the issue of the validity of an assignment upon the distribution of an estate (*Estate of Howe,* 161 Cal. 152 [118 P. 515]), upon inquiry 'into the circumstances surrounding the execution of such' agreement and any accompanying instrument procured from the prospective beneficiary.'' [Emphasis added.] The clear implication from the foregoing is that a probate court may determine the validity of an agreement that property shall be distributed in a certain manner. (See *Estate of Henshaw,* 68 Cal.App.2d 627 [157 P.2d 390]; *Estate of Cazaurang,* 75 Cal.App.2d 217 [170 P.2d 694]; *cf. Estate of McPherson,* 90 Cal.App.2d 17 [202 P.2d 565]; *Estate of Ettlinger,* 87 Cal.App.2d 494 [197 P.2d 163].)

█ It is claimed, however, that while the probate court may determine the validity of such an agreement, it is limited in doing so to that part of the property which is a part of the estate; that although the court found the real property not to be community property, such finding lacked evidentiary support, and the furnishings were found to be community property; and that Stanley's, the surviving husband's, interest in community property is no part of Mattie's estate. We do not believe the probate court's jurisdiction is so limited. Where an agreement embraces both property that is a part of the estate and property which is not a part of the estate, especially community property, the probate court has jurisdiction to decide the validity of the entire agreement. █ It must be remembered that a probate court has jurisdiction to determine rights under contracts ancillary to the exercise of its probate jurisdiction. (*Bennett* v. *Forrest,* 24 Cal.2d 485 [150 P.2d 416]; *Dobbins* v. *Title Guar. & Trust Co.,* 22 Cal.2d 64 [136 P.2d 572].) And, as is said in *Estate of Cover,* 188 Cal. 133, 139 [204 P. 583], quoting from *Estate of Warner,* 6 Cal. App. 361 [92 P.191]: ''The superior court, while sitting in matters of probate, is the same as it is while sitting in equity, in cases at law, or in a special proceeding, and when it has jurisdiction of the subject matter of a case falling within either of these classes, it has power to hear and determine, in the mode provided by law, all questions of law and fact, the determination of which is ancillary to a proper judgment in such case. This is an incidental power pertaining 'to all courts for the purpose of enabling them to exercise the jurisdiction which is conferred upon them.' '' If the jurisdiction is denied, confusion, delay and uncertainty follow. The probate court might determine the part of the agreement addressed

to it as valid, and a superior court might reach a contrary result on the remainder of the contract, or vice versa. Not only would the result be making a new contract for the parties, but the litigation would be piecemeal. Such conditions should be avoided. (*Garson* v. *Division of Labor Law Enforcement*, 33 Cal.2d 861 [206 P.2d 368].)

The decree is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied October 27, 1949.