259 Cal.App.2d 492 (1968)
Estate of VIRGINIA L. PETERSON, Deceased. JACK ROBERTSON, as Executor, etc., Petitioner and Respondent,
v.
MARGARET M. WILBER et al., Objectors and Respondents; ARTHRITIS AND RHEUMATISM FOUNDATION, Objector and Appellant.
Civ. No. 23774. 
California Court of Appeals. First Dist., Div. Four. 
Feb. 27, 1968.
 Cushing, Cullinan, Hancock & Rothert and Brian P. Burns for Objector and Appellant.
 Burnett, Burnett, Keough & Cali., William J. Keough, Crist, Peters, Donegan & Brenner and John M. Brenner for Objectors and Respondents.
 Robertson, Alexander & Luther and Myron D. Alexander for Petitioner and Respondent. *495
 DEVINE, P. J.
 This case presents two quite separate questions of law: first, whether a half-sister of a testatrix may challenge a charitable devise or bequest under section 41 of the Probate Code; and second, whether an order setting aside an agreement by the testatrix' surviving husband to settle a will contest and to assign to a charity all of his rights because of mistake and because of gross unreasonableness of consideration should be affirmed. Because of the disparate character of the two problems, the facts particular to each are stated separately following a general recital.
 General Facts
 Virginia L. Peterson executed her last will on December 1, 1963, and died on May 25, 1964. By the will, the entire residue of the estate above a $5,000 bequest and a few small dispositions is left to The Arthritis Foundation, Northern California Chapter (hereafter, the Foundation). The estate is somewhat over $100,000 and is all separate property. The bequest to the Foundation, a charitable organization, was over 90 percent of the value of the estate.
 The husband, Paul P. Peterson, against whom the wife had obtained an interlocutory but not a final decree of divorce, filed a contest of the will, alleging that he is interested in the estate as a beneficiary of an earlier will; that he is informed and believes that decedent left no surviving heirs at law; and that at the time of the alleged execution of the purported will the decedent was not of sound and disposing mind. It may be said that there is evidence that decedent was emotionally disturbed at various times late in her lifetime, [fn. 1] and that, although of course the subject of her competency is not directly before us, the contest was one in which settlement negotiations could be expected. Negotiations did take place, as described below, as a result of which there was a settlement of $5,000 which was to be paid from the amount to be received by the Foundation. Counsel for the husband, at his prodding, kept urging the executor's attorney to get to the payment, as the months went by. Suddenly there was a new development. An heir-hunting firm discovered a half-sister of the decedent, Margaret M. Wilber, in Denver, Colorado. She filed opposition to distribution on the ground of excessive charitable disposition. Thereupon, the husband sent notice of rescission of the settlement agreement and also filed objection on the ground of *496 excessive charitable disposition.
 The probate court ruled that:
 1. The bequest to the Foundation was in excess of the amount permitted by Probate Code, section 41.
 2. The purported settlement by decedent's husband entered into in June 1965 was null and void; that it was entered into as a result of an honest mistake by him and his attorneys as to the application of Probate Code, section 41; that the Foundation, through its attorneys, was aware of the application of Probate Code, section 41; that the executor was the agent of the Foundation, and that both the Foundation and the attorneys for the executor knew of the applicability of that section and knew that neither Mr. Peterson nor his attorneys was aware of the applicability of that section and did nothing to rectify or advise Mr. Peterson or his attorneys of their mistake; that the consideration paid by the Foundation was so grossly inadequate that the Foundation must be charged with knowledge of Mr. Peterson's mistake.
 3. The court, on its own motion, pursuant to section 1020.1 of the Probate Code, having inquired into the assignment of Mr. Peterson to the Foundation, finds such consideration inadequate and grossly unreasonable; that therefore said release is of no force and effect.
 4. The objections to distribution filed by Mr. Peterson and Mrs. Wilber are sustained because the bequest to the Foundation was in violation of Probate Code, section 41.
 5. After specific bequests provided for in the will have been satisfied, one-third of the residue should go to the Foundation, and one-third each to Mr. Peterson and Mrs. Wilber.
 Facts and Law Relating to the Half-Sister's Claim
 Section 41 of the Probate Code, so far as it is applicable to the case, provides that devises and legacies to charitable corporations or societies may not exceed one-third of the testator's estate as against his spouse, brother, sister, nephew, niece, descendant or ancestor who under the will or the laws of succession would otherwise have taken the property.probate Code, section 43 exempts charitable devises and bequests from the limitation of section 41 when the will was executed six months prior to the death of the testator if the testator left no spouse, child, grandchild or parent. Virginia L. Peterson's will was executed within six months of her death; wherefore, section 41 applies. If, therefore, a half-sister be included in the word "sister" in section 41, Margaret M. *497 Wilber would be entitled, upon timely challenge, to one-third of the residual bequest because, under Probate Code, section 223, she would have taken one-half of the estate in case of intestacy, the surviving spouse taking the other half. By the terms of section 41 a pro rata deduction from charitable devises and legacies shall be made so as to reduce the aggregate thereof to one-third of the estate.
 Two preliminary observations may be made before we take up the principal question. The first is that although appellant Foundation does not concede that Margaret Wilber was testatrix' half-sister, the evidence is ample to support the finding that she was. The two women had the same mother. The second observation is this: we must reject the proposal made by appellant that although in a different case the court might hold that a half-sister is included within the class of persons enumerated in section 41, it need not do so in this case because the allowance of her claim will not in any way effectuate the purpose of the statute and will contravene the express wishes of the testatrix. Appellant's proposal is based on the facts that the two women were almost strangers in fact and had almost no communication with each other, and that they had never met. In about 1950, while visiting Denver, where Mrs. Wilber lived, decedent telephoned Mrs. Wilber and invited her to see "their mother." Mrs. Wilber declined, saying that she thought it better to leave the situation as it was after many years of separation. But we cannot change the statute at will. If section 41 includes half-sisters generally, it includes this half-sister. The fact that the express wishes of the testatrix may be contravened does not change the case from any other (except perhaps in the degree of frustration of her wishes) in which a charitable devise or legacy is reduced or even, in the case of death within thirty days, annulled by the statutes and by timely challenge.
 It is of the nature of the statute limiting gifts to charity that they contravene the wishes of the testator or testatrix. As examples, in Estate of Moore, 219 Cal.App.2d 737 [33 Cal.Rptr. 427], where the testator had virtually disinherited his brother, his only heir at law, by giving him one dollar, and after one bequest to a stranger had left the residue to a charity and had made no substitutional gift, the brother was entitled to the excess over one-third; and in Estate of Thomason, 245 Cal.App.2d 793 [54 Cal.Rptr. 229], where the testatrix had made but limited provision for her husband because, she said in the will, he had suffered from a drinking problem, *498 and had left an excessive gift to charity, the husband's right to challenge the excess was recognized.proposals have been made from time to time that the statutes relating to charitable dispositions be amended, partly because of the ease with which they can often be avoided by substitutional gifts, as described in California Will Drafting (Cont. Ed. Bar) sections 3.19, 3.20, pp. 109, 110, and 4 Witkin, Summary of California Law (1960) section 34, pp. 3022-3024; or because the classes of persons entitled to challenge are too numerous, embracing persons whom the testator had no duty to support. It has been proposed that either the classes be reduced or family maintenance legislation be made part of the laws of succession. (Franzen, Thy Will Be Done: The Status of Charitable Bequests in California (1967) 18 Hastings L. J. 450, 460-461.) But these proposals are for the Legislature, not for the courts, to consider. The policy of the Legislature that certain heirs are to be protected in preference to indefinite beneficiaries of charitable institutions is still soundly enunciated by legislative and decisional law. (Estate of Thomason, supra, p. 802.) We have no difficulty in recalling the cases cited by appellant as expressing the favorable disposition of the law towards charities: Estate of Hughes, 202 Cal.App.2d 12 [20 Cal.Rptr. 475], and Estate of Reardon, 243 Cal.App.2d 221 [52 Cal.Rptr. 68]. But these had to do with the necessity for challenges to be put into motion by one of the class known as the protected heirs; the cases did not purport to exclude any one ordinarily included within a described class. The cases cited by appellant, which decide that certain heirs are not within protected classes, are ones in which Probate Code, section 41 could not reasonably be interpreted as covering the claimants. In Estate of Zaepfel, 102 Cal.App.2d 774 [228 P.2d 600], the claimant's relationship to an adoptive parent had been severed by a subsequent adoption; in Estate of Jephcott, 115 Cal.App.2d 277 [251 P.2d 1001], the children of a predeceased spouse quite obviously are not within the statute.
 [1] Turning now to the principal question, we conclude that a half-sister is included among the classes specified in section 41. Our reasons are these:
 1. In Estate of Clippinger, 75 Cal.App.2d 426 [171 P.2d 567], a half-sister successfully challenged, even on appeal from a judgment determining heirship, an excessive charitable bequest. The case was decided upon other issues and the point of appellant's being a half-sister was not mentioned in the briefs, which we have examined, submitted to the Court of *499 Appeal or to the Supreme Court on petition for hearing. The fact that neither counsel nor any of the judges to whom the case was presented did not raise the issue of the half-sister's eligibility to contest the bequest is, however, not without significance.
 [2] 2. The words "brothers and sisters" as used in statutes are commonly construed to include half-sisters and half-brothers. (5A Words and Phrases, p. 419; Woodward v. United States, 167 F.2d 774, 778-779.) The same meaning is ordinarily given in the construction of wills. (Thompson on Wills (3d ed. 1947) 283, p. 439; 4 Page on Wills, 34.26, P. 457.)
 3. Probate Code, section 254 provides that kindred of the half blood inherit equally with those of the whole blood in the same degree (except as to certain ancestral gifts to the intestate). We realize that section 254 is a statute of succession and that section 41 is a statute limiting the right of testamentary disposition. But there is a connection between section 41 and the ordinary succession statutes. Section 41 allows the described heirs to effectuate reduction of charitable legacies only if they, the heirs, would otherwise have taken the excess over one-third, and provides for transfer of the charitable dispositions only to the extent that the heirs would have taken.
 4. In Estate of Lynch, 132 Cal. 214, 216 [64 P. 284], the court says: "The well-established rule in this country is that where the term 'brothers or sisters' is used without limitation, it includes half-brothers and half-sisters." The court points out that this was the rule in the common law except as to inheritance of real estate, wherein there was a special rule as to half-brothers because they were not presumptively of the blood of the first feudatory. The court remarked that the inclusion of half-brothers and half-sisters within the term "brothers and sisters" is the rule of the civil law.
 5. Until 1937, section 41 of the Probate Code limited charitable gifts so that all heirs of the testator were protected. (Stats. 1931, ch. 281, p. 589.) When, in 1937, section 41 was amended to limit "protected heirs," as they are frequently called, it would be expected that if the Legislature intended to restrict "brothers and sisters" to those of the whole blood it would have said so, because of the meaning ascribed to the words in the statutes of succession, in Estate of Lynch, in treatises on wills, and in general legal usage. *500
 Facts and Law Relating to the Spouse's Claim
 [3] There is no doubt that, apart from the settlement agreement, the husband had the right to challenge the charitable gift. The interlocutory decree did not terminate his status as spouse. (Estate of Seiler, 164 Cal. 181 [128 P. 334, Ann. Cas. 1914B 1093]; Estate of Teel, 34 Cal.2d 349, 351 [210 P.2d 1].) This right would remain until a decree of distribution would become final. (Estate of Moran, 122 Cal.App.2d 167 [264 P.2d 598]; Estate of Scott, 217 Cal.App.2d 111, 115 [31 Cal.Rptr. 438].) The challenge was made before the decree of distribution.
 Nor did the mistake of the husband's attorney in overlooking section 41 of the Probate Code, as described below, cause a delay which in itself would have been fatal to the husband's claim. True, but for action on the part of Mrs. Wilber, the husband probably never would have known of his right to challenge the gift. But when her challenge occurred it awakened the husband's counsel to the neglected claim of his own client before it would have been barred by final distribution. The only thing standing in the way of the husband's claim is the settlement agreement. We now discuss the order of the trial court, which held that agreement to be invalid, and we do so giving full effect, as we must on appeal, to all legitimate inferences drawn by the trial court as well as to evidentiary facts which are favorable to respondent husband.
 A. Mistake
 [4] Section 1567 of the Civil Code declares that an apparent consent is not real or free when obtained through mistake. Section 1578 of the Civil Code provides that mistake of law constitutes a mistake within the meaning of the article which also contains section 1567: "when it arises from: ... (2) A misapprehension of the law by one party, of which the others are aware at the time of contracting, but which they do not rectify." The probate judge found that in the negotiations leading up to the signing of the agreement and at the time of signing it, the Foundation, through its attorneys and through its agent for the purpose of negotiating the settlement, namely the attorney for the executor, "knew of the applicability of Probate Code 41 and knew that neither Paul P. Peterson nor his attorney was aware of its applicability, and did nothing to rectify or advise Paul P. Peterson or his attorney of this mistake." The court further found that "Paul P. Peterson and his attorney overlooked the application *501 of Probate Code 41 to the will of decedent; that said oversight was an honest mistake of the kind occasionally made by reasonably prudent men and does not constitute the neglect of a legal duty." The fact that the husband knew of no rights except that of a will contest is established by his testimony, and the fact that his attorney completely overlooked section 41 was made manifest to the trial judge by the emphatic testimony of the attorney reproaching himself for his own oversight. But appellant argues that no charge has been made, or can be made, that the Foundation was aware of the husband's mistake of law. A reading of the transcript of the testimony shows that the charge was made, in essence, and a reading of the finding referred to above shows that the court agreed with it. We hold that the court's finding is amply sustained.
 The petition of the husband, Paul Peterson, for revocation was filed about three months after the will was admitted to probate. In February 1965 the executor asked Peterson's attorneys to give him a settlement figure. They offered to settle for one-half of the estate.peterson's counsel stated that it was their opinion that the estate exceeded $200,000. The offer was rejected. Depositions were taken. There were extended negotiations. Peterson's attorneys offered to dismiss the contest for $5,000. This was accepted by the Foundation but the Foundation agreed to make the payment only from its share of the estate.
 [5a] There are several elements of proof which reasonably could justify the judge's conclusion that the attorneys for the Foundation and for the executor knew of the mistake of the husband and of his counsel, and knew that in signing the agreement the husband and his counsel thought they were merely settling the will contest and transferring to the Foundation no more than any rights which Peterson had as legatee under a former will or wills or as heir in case such wills were invalid. Some of these elements are to be found in the circumstances of the negotiations and some in the agreement itself.
 Elements of proof to be found in the circumstances of the negotiations are:
 1. The negotiations on behalf of the Foundation were carried on by the attorney for the executor. [6] It is ordinarily the duty of the executor to defend the will against contest. (Estate of Dunton, 15 Cal.App.2d 729, 731 [60 P.2d 159].) But in a proceeding to establish a right under section *502 41 of the Probate Code, the executor has no interest and should not participate actively. (Estate of Friedman, 176 Cal. 226, 228-229 [168 P. 21].) The active participation of the executor's attorney could reasonably be inferred by the trial court to have colored the negotiations as being the business of settling the will contest and its incidents only. Although the settlement had to be made by the Foundation and although the husband's proposals were referred to the Foundation, the attorneys for the Foundation were at all times insulated from direct contact with counsel for the husband.
 [5b] 2. Following commencement of the will contest the husband made a very large demand, for one-half of the estate. After depositions had been taken and hospital records examined, the demand was dropped to $5,000, about one-twentieth of the estate. It is hard to believe, and the trial judge evidently did not believe, that those who were negotiating on behalf of the Foundation did not know that the husband and his counsel had overlooked section 41. The husband could have had two-thirds of the residuum of the estate, or about $60,000, under the facts as known at that time (Mrs. Wilber's existence was not then known) simply by filing a challenge under section 41.
 Why should he be negotiating to get one-twelfth of that which might readily have been his? Why should he reduce his demand drastically following depositions related to the will contest? The attorney for the executor had answers to these questions, but the trial judge was at liberty to find them unsatisfactory. They were: (a) That perhaps there was a cloud on the marriage; but the reference to the cloud was itself nebulous, particularly in view of the fact that the attorney for the executor had been engaged in the divorce action. (b) That Peterson had said at some time (when, and where, and under what circumstances, do not appear) that he wanted no part of the estate; but the fact that the will contest had been filed and the large demand had been made would seem to negate whatever statement it was that the husband had made. (c) That there might have been various reasons known to the husband's counsel for not filing a demand under section 41; but the conclusion to be made from this later indefinite statement was for the trial judge to make. Whether appellant knew of respondent's mistake was not susceptible of direct proof. (See Baines v. Zuieback, 84 Cal.App.2d 483, 490 [191 P.2d 67].)
 3. There was testimony by one of the lawyers for the Foundation that when its chief counsel learned of the notice *503 of rescission by the husband and his counsel, he said, "Well, I guess they just saw Probate Code 41." Although this does not necessarily show that the chief counsel knew at an earlier date of the other parties' oversight, it would not be unreasonable for the trial judge to infer that the statement supports the other elements of proof.
 4. Counsel for the husband testified that when he announced to counsel for the executor, following Mrs. Wilber's claim, that he had not known of the effect of section 41 on the settlement, the executor's attorney "agreed readily that he and I were both operating in the dark." The executor's attorney testified later that at all times when he was negotiating the settlement he was aware of section 41, but he offered no testimony denying the testimony that he had told the husband's attorney that he as well as the husband's attorney had been "operating in the dark." The trial court could infer from this that the executor's attorney had been aware of the other parties' oversight and had attempted, when he was first confronted with the rescission, to have it appear that he, too, had overlooked section 41.
 Elements of proof to be found in the document of settlement are:
 1. It is entitled "Transfer and Waiver of Disputed Claim in Estate and Agreement to Dismiss Will Contest." There was, at the time of the execution of the document, no "disputed claim" except the will contest itself.
 2. Several of the paragraphs of the agreement which describe the matter about to be settled give evidence of a desire on the part of the draftsman to avoid, so far as possible, expressions which might suggest to the parties with whom he was negotiating the existence of any other right possessed by respondent than that flowing from the prior will, or if that will were invalid, from his position as heir. The first of these reads: "Whereas the Executor of the estate and under the Will of Virginia L. Peterson has opposed the contest of Paul P. Peterson of the aforesaid Will of decedent." This of course gives no clue to anything but the will contest. The second is: "Whereas Paul P. Peterson is not named as a devisee or legatee and is not entitled to any portion of the estate of decedent under the terms of the aforesaid last Will dated December 1, 1963, but may be entitled to a portion of the estate of decedent under previous Wills of decedent or as an heir at law of decedent under the laws of intestate succession of the State of California in the event previous Wills are *504 invalid, or otherwise." Insofar as this paragraph relates to respondent's status as heir, it has to do with the possibility of invalidity of the will, with the exception of the words "or otherwise." These two words seem to be purposely vague. The third is: "Whereas a dispute exists as to the right of Paul P. Peterson to take as an heir, legatee, devisee or creditor any portion of the estate of decedent and said Paul P. Peterson desires to settle, waive and transfer his claim, if any, for the sum of five thousand dollars ($5,000.00)." This refers to "a dispute," in the singular, which was to be settled. The only dispute was that contained in the will contest. The fourth is: "Whereas the Arthritis and Rheumatism Foundation, Northern California Chapter, also known as The Arthritis Foundation, Northern California Chapter, is one of the beneficiaries named under the document dated December 1, 1963, purporting to be the Will of decedent, and it is for the benefit of said Foundation and other named beneficiaries under the aforesaid document dated December 1, 1963, and heirs of decedent that the claim of Paul P. Peterson as an heir, legatee, devisee or creditor be and is being settled, waived and transferred." This refers to a benefit to the other beneficiaries of the will, as well as to the Foundation, from the settlement. Of course, the settlement of the will contest would be for the benefit of the other beneficiaries, but transfer or relinquishment of respondent's right under section 41 would be of no benefit to the other beneficiaries.
 We observe that nowhere in the document is the word "spouse" used, although it was as spouse rather than merely as heir that respondent would be entitled to any excess under section 41.
 We think it could reasonably be inferred by the trial judge that the vagueness of language in the document is in itself evidence that these counsel had knowledge (not absolute certainty, but knowledge) that the parties with whom they were dealing were unaware of the husband's right under section 41.
 [7] Since Civil Code, section 1578, subdivision 2, refers to a misapprehension of the law by one party which the others are aware of but do not rectify, we take it that the mistake is something which ought in all conscience to be rectified. It would seem reasonable to hold that, had there been no will contest, the attorneys for the Foundation and for the executor were under no duty to inform the husband gratuitously of his right to challenge the charitable gift. Indeed their duty may have been to remain silent. Likewise when it came to settling the *505 will contest, we believe there was no duty on their part to suggest section 41 if they intended simply to let the estate go to final distribution, after which no challenge could be made. They need not have used words in the settlement agreement which would excite a challenge. But if the attorneys for the Foundation and for the executor intended at the time of the settlement to obtain a waiver and transfer of the spouse's rights to challenge and they knew of his misapprehension of the law, we hold that they were under a duty to inform him, or, on the other hand, to consider the agreement as settling only that which both parties were aware of and desired to settle.
 [8] It is only by use of the settlement agreement that appellant could effect a bar to the husband's challenge. Up to the time when the husband signed that agreement his counsel simply overlooked an important right of the client. Until then Civil Code, section 1578, subdivision 2 was inoperative because it relates to mistake in the making of contracts. But the oversight became something more. It became a misapprehension of law within the meaning of section 1578, subdivision 2 when the contract was made which purported, in the view of appellant, to release and transfer to appellant the right, unmentioned in the contract, unknown to respondent and his counsel, and known, together with the fact that the husband and his counsel were ignorant of it, to counsel for the appellant and counsel for the executor.
 B. Probate Code, Section 1020.1
 As an alternate basis for his ruling, the probate judge found the consideration for the settlement agreement to be grossly unreasonable, as described in section 1020.1 of the Probate Code, and the court therefore did not make distribution according to its terms but found it to be of no force and effect. The court acted under section 1020.1 on its own motion. We do not find in the briefs of appellant any argument that the consideration was not in fact grossly inadequate to support the transfer of the spouse's right under section 41. Reference is made to the long months of negotiation, but the negotiation, so far as the husband and his attorney were concerned, was about the will contest.
 [9] Appellant's argument is that section 1020.1 is inapplicable because (1) its primary purpose is to protect persons who have an interest in estates from unfair contracts with heir hunters, (2) it should not be applied as against a charity, *506 and (3) the section is not to be used to correct the failure of attorneys to advise clients of their rights. As to appellant's argument (1), we observe that although the original purpose of the section was protection against heir hunters, the section is not limited to that class only. It has been applied to assignees and transferees generally. (Estate of Simmons, 217 Cal.App.2d 580, 586 [31 Cal.Rptr. 861].) (Appellant states that the court did not, of its own motion, examine whatever transfer there may have been by Mrs. Wilber to the heir-hunting firm which discovered her. This is irrelevant to the court's right to examine the husband's purported transfer.) [10] As to appellant's argument (2), we see no reason why a charity should not be held to the terms of section 1020.1. The statute is general in its terms. (Burchell v. Strube, 43 Cal.2d 828, 836 [279 P.2d 1].) Although the law looks favorably upon charities (Estate of Hughes, 202 Cal.App.2d 12 [20 Cal.Rptr. 475]; Estate of Reardon, 243 Cal.App.2d 221 [52 Cal.Rptr. 68]), it does not exempt them from the same standards in making contracts of the kind referred to in the Probate Code section as those applied to other persons or associations. [11] As to appellant's argument (3), the section is not to be avoided by a transferee simply because the transferor had counsel. In Estate of Freeman, 238 Cal.App.2d 486 [48 Cal.Rptr. 1], wherein a transfer was set aside, the transferor had counsel.
 [12] Finally, a distribution made pursuant to procedure under section 1020.1 must be left in great measure to the sound discretion of the probate judge. An appeal from an order made pursuant to the section is governed by the general rules applying to appeals. (Estate of McPherson, 94 Cal.App.2d 906, 908 [212 P.2d 41]; Estate of Simmons, supra, 217 Cal.App.2d at p. 585.)
 The order appealed from is affirmed.
 Rattigan, J., and Christian, J., concurred.
NOTES
[fn. 1] 1. The will was executed while testatrix was in the hospital, about five days after she had attempted suicide.