[Civ. No. 37951. First Dist., Div. One. Dec. 15, 1976.]

Estate of OTTO W. COOK, Deceased.
CONNIE M. MARKS, Petitioner and Appellant, v.
CHRISTOPHER J. COOK, Objector and Respondent.

## COUNSEL

Jones & Burriss and Bryan Jones for Petitioner and Appellant.

Horan, Lloyd, Dennis & Farr and Stephen W. Dyer for Objector and Respondent.

## OPINION

**BRAY, J.**\*—Petitioner and appellant Connie M. Marks appeals from a judgment of the Monterey County Superior Court.

### ISSUES PRESENTED

1. The probate court had jurisdiction to resolve the claims of appellant.

---

\*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

2. The order is appealable.

3. There is substantial evidence to uphold the court's determination that the assignment was not fraudulent.

4. The court correctly held that the entire amount of the bank's claim had priority over appellant's lien.

## RECORD

On February 16, 1974, Otto Cook died leaving a will and codicil which provided for a legacy to his son Dr. Christopher Cook of $25,000 cash and 500 shares of the Eastman Kodak Corporation. The will and codicil were admitted to probate in Monterey County on March 8, 1974. On March 29, Dr. Cook executed an assignment of his entire interest in the estate to the Chase Manhattan Bank as security for a loan. This assignment was filed with the probate court on April 1. Consideration for the assignment totaling $45,000 was paid to Dr. Cook between March 20 and April 29. On August 14, a writ of execution directed against Dr. Cook's interest in the estate was served upon Martin May, executor of the estate. The writ was obtained by appellant Connie Marks, divorced wife of Dr. Cook. Dr. Cook was in arrears in alimony and child support payments to appellant in the sum of $28,966 plus $7,513 interest.

On October 25, 1974, appellant filed in the probate court a "Petition for Determination of Entitlement to Distribution of Estate." On November 8, appellant filed a "Motion for Inquiry into Circumstances of Assignment of Interest of Legatee (Probate Code Section 1020.1)" on the ground that the assignment to the Chase Manhattan Bank was fraudulent.

A hearing was held in which evidence was taken and the parties stipulated that the court later receive further interrogatories and depositions. The court decided adversely to appellant's petition and motion. Findings of fact and conclusions of law and judgment in favor of the bank were duly filed.

## FACTS

On January 11, 1961, appellant Connie Marks and respondent Dr. Christopher Cook were divorced in the Republic of Mexico. On January 26, 1966, by stipulated judgment in the San Francisco Superior Court the

validity of the Mexican judgment was affirmed and Dr. Cook was ordered to pay alimony and child support totaling $450 per month. Dr. Cook quickly fell into arrears in his payments. An order to show cause was issued in September 1968 when payments were over $4,000 in arrears; however the order was never served on Dr. Cook because his whereabouts was not known.

Otto Cook, the father of Dr. Christopher Cook, died on February 16, 1974. Included in the will and codicil left by Otto Cook was a legacy for Dr. Cook of 500 shares of stock in Eastman Kodak and $25,000. Martin May, the executor of the estate, informed Dr. Cook of the terms of the will soon after the death of Otto Cook. Dr. Cook, a resident of New York, was in California briefly at his father's death. Shortly after the death of Otto Cook, Dr. Cook began discussions with Joseph A. Wilson of Chase Manhattan Bank in New York City about obtaining a loan. The bank first rejected the idea of issuing a mortgage on a house Dr. Cook wished to buy. The parties discussed a secured loan and the bank suggested that Dr. Cook use his interest in his father's estate as collateral. After further discussion Dr. Cook sent a letter of confirmation to the bank, and on March 29, 1974, executed an assignment of his interest in the estate to the bank in return for a $45,000 loan. The assignment was filed with the Monterey County Superior Court Clerk on April 1, 1974.

Chase Manhattan advanced $7,300 to Dr. Cook prior to actual execution of the assignment and extended the rest of the $45,000 by April 29, 1974.

On August 1, 1974, Bryan Jones telephoned Martin May and advised May that he represented Mrs. Connie Marks with respect to support moneys owed her by Dr. Cook.

On August 6, 1974, Dr. Cook applied for a $3,000 increase in the original loan from Chase Manhattan. Dr. Cook and Mr. Wilson, on behalf of the bank, agreed that the additional loan would also be secured by the assignment of Dr. Cook's legacy. The additional funds were advanced on August 16. Also in August Dr. Cook applied for an installment credit loan through Chase Manhattan. The bank agreed to commit itself to the sum of $10,000. On August 21, funds were advanced to the respondent pursuant to the commitment. Security for repayment included both a passbook account and an interest in any cash proceeds remaining after payment of the principal obligation secured by respondent's interest in the estate.

On August 14, 1974, Martin May, as the executor of Otto Cook's estate, was served with a copy of a writ of execution and notice of levy evidencing Dr. Cook's San Francisco support arrearages of $28,966 plus interest. The next day Mr. May wrote Bryan Jones as follows: "In view of [the] assignment there would be nothing in the estate subject to the levy." At the same time he advised Dr. Cook of the levy.

The executor of the estate, pursuant to a decree of preliminary distribution, had forwarded Dr. Cook's 500 shares of stock to the bank in late July 1974. The bank sold the Eastman Kodak stock in October 1974 for about $33,000 reducing Dr. Cook's indebtedness on the $48,000 loan to $15,099. According to the terms of Otto Cook's will, Dr. Cook is entitled to distribution of an additional $25,000.

The position of Dr. Cook and apparently of the executor of the estate is that the assignment takes precedence over the judgment lien and that the entire legacy of Dr. Cook must be distributed to Chase Manhattan Bank. Appellant contends that the undistributed $25,000 legacy is fully subject to her lien.

1. The probate court had jurisdiction to resolve the claims of appellant.

In *Fount-Wip, Inc.* v. *Golstein* (1972) 29 Cal.App.3d 751 [105 Cal.Rptr. 780], a judgment creditor attached the debtor's interest in a decedent's estate and the probate court ordered distribution of the interest to the sheriff subject to the claim of the creditor. The former wife of the debtor then filed a third-party claim pursuant to section 689 of the Code of Civil Procedure which sets forth the procedure for litigating the title to personal property upon which there has been a levy, and the creditor responded by filing a petition under the statute to determine title. The creditor made various contentions that the procedure was improper. The trial court however found the procedure followed by the third party claimant was appropriate and that the levy was ineffective against an assignment to her executed prior in time to the creditor's suit against her former husband.

The question with which we are confronted is whether the procedure followed in *Fount-Wip* is the exclusive method of determining the issue between an assignee of an interest in an estate and an attaching creditor. In other words, is the procedure adopted here allowable? We have

concluded that the *Fount-Wip* procedure is not an exclusive method of procedure and that that adopted in this case is permissible.

Probate Code section 1020.1 provides in pertinent part that "The court before making distribution of any property of a decedent to any assignee or transferee of any heir, devisee or legatee . . . pursuant to any agreement, request or instructions of any heir, devisee or legatee . . . may on the motion of any person interested in the estate . . . or on its own motion inquire into the consideration for such assignment, transfer, agreement, request or instructions . . . and into the circumstances surrounding the execution of such assignment, transfer, agreement, request or instructions and if it finds . . . that any such assignment, transfer, agreement, request or instructions was obtained by duress, fraud or undue influence it may refuse to make distribution pursuant thereto except upon such terms as it deems just and equitable."

The court in *Fount-Wip* stated that "the section has been construed as being applicable not only to heir hunters but to assignees and transferees generally. (*Estate of Peterson,* 259 Cal.App.2d 492 [66 Cal.Rptr. 629].) ■ The court has discretion in determining whether to effectuate the assignment or transfer in question. (*Estate of Simmons,* 217 Cal.App.2d 580 [31 Cal.Rptr. 861].) Section 1020.1 has been described as permissive rather than mandatory (*Estate of Kerr,* 63 Cal.2d 875, 879, 880 [48 Cal.Rptr. 707, 409 P.2d 931]), and there is nothing in the statutory language itself, or the cases, which suggests that it affords an exclusive method of litigating the claim of a stranger to the estate." (29 Cal.App.3d 751 at p. 756.)

Certainly when appellant moved the court for inquiry into circumstances of the assignment to Chase Manhattan Bank under Probate Code section 1020.1, the probate court had discretion to inquire into whether the assignment was made with fraudulent intent or was for adequate consideration as the parties were "interested in the estate."

The extent of the probate court's jurisdiction was analyzed by the California Supreme Court in *Estate of Stanley* (1949) 34 Cal.2d 311 [209 P.2d 941]. In *Stanley,* the probate court inquired into a written agreement between the husband and the daughter of an intestate decedent, by which they assented to distribution of the property in a certain manner. The court stated that under Probate Code section 1020.1, the jurisdiction of a probate court to determine rights under an

agreement assigning an interest in an estate was ancillary to the exercise of the court's probate jurisdiction. The clear indication of the court was that the probate court has the power to determine how the property should be distributed, after, and in accordance with, its ruling on the validity of the assignment. (See generally *Estate of Lund* (1944) 65 Cal.App.2d 151 [150 P.2d 211].)

In *Estate of Baglione* (1966) 65 Cal.2d 192, 196-197 [53 Cal.Rptr. 139, 417 P.2d 683], the court said that the probate court "can determine whether an assignment or other transfer of the interest of an heir, legatee or devisee to a third party is valid and order distribution accordingly. . . . When a party invokes the jurisdiction of a court sitting in probate by asserting a substantive right in a particular piece of property or in certain assets as an heir, legatee, or devisee, he may also obtain a judgment in that court determining any additional claims that he asserts against those in privity with the estate in the same property. [Citations.] The rationale for this exception is the conservation of time, energy, and money of all concerned. To deny a superior court sitting in probate the power to determine the whole controversy between the parties before it is pointless. In the exercise of its legal and equitable powers (see *Schlyen* v. *Schlyen* [(1954) 43 Cal.2d 361, 371 (273 P.2d 897)]; *Estate of Cover,* 188 Cal. 133, 139 [204 P. 583]), a superior court sitting in probate that has jurisdiction over one aspect of a claim to certain property can determine all aspects of the claim. A claimant is not required to sever and litigate a multifaceted claim in separate proceedings once all the necessary parties are before the court." (See also *Estate of Plum* (1967) 255 Cal.App.2d 357, 362 [63 Cal.Rptr. 241].)

*Estate of Howe* (1911) 161 Cal. 152 [118 P. 515], which held that the probate court did not have jurisdiction of a dispute between an heir and one claiming to be an execution purchaser of his interest in the estate is not in point as it was decided long before the adoption of section 1020.1 of the Probate Code, which was added in 1941, and the decisions of the cases above set forth. *Noble* v. *Beach* (1942) 21 Cal.2d 91, 96 [130 P.2d 426], is likewise not in point.

In *Estate of Henshaw* (1945) 68 Cal.App.2d 627, 634 [157 P.2d 390], the court appears to consider Probate Code section 1020.1 to be very broad in its extension of probate jurisdiction in disputes of this kind. In *Estate of Peterson* (1968) 259 Cal.App.2d 492 [66 Cal.Rptr. 629], the parties were two heirs with conflicting claims, one of whom had assigned to the

other an interest in the estate. In. *Estate of Simmons* (1963) 217 Cal.App.2d 580 [31 Cal.Rptr. 861], the contest was between the administratrix and the assignee of an heir's interest.

In *Estate of Peterson, supra,* 259 Cal.App.2d 492 at page 506, the court held "a distribution made pursuant to procedure under section 1020.1 must be left in great measure to the sound discretion of the probate judge."

Remanding the cause to the probate court with directions that distribution be made to the Sheriff of Monterey County would be injurious to both parties hereto since it would force relitigation by way of the third-party claim remedy provided in section 689 of the Code of Civil Procedure of the very question which has already been resolved at the instance of appellant in the probate court and consume additional court time in hearings that would prove to be repetitive.

2. The order is appealable.

Probate Code section 1240 lists appealable orders in probate proceedings. No order is appealable from probate court unless it is included in the provisions of section 1240. (*Estate of Muller* (1969) 2 Cal.App.3d 259, 262, fn. 1 [82 Cal.Rptr. 531].) Respondent suggests doubt whether the order involved here is an appealable order in light of statements made in *Estate of Ramsey* (1951) 107 Cal.App.2d 372, 376 [237 P.2d 20], and *Estate of Reilly* (1947) 81 Cal.App.2d 564, 570 [184 P.2d 922].

The *Ramsey* case is no authority on the question because the court there expressly declined to raise the issue of jurisdiction on appeal. The *Reilly* case, citing *Estate of Butler* (1947) 29 Cal.2d 644 [177 P.2d 16, 171 A.L.R. 343], indicates that appeal was appropriate from a decree of final distribution but not from a prior order denying a motion to disapprove an assignment. (*Estate of Reilly, supra,* 81 Cal.App.2d 564 at p. 570.) Neither case contains any discussion of the issue.

The subsequent case of *Estate of McPherson* (1949) 90 Cal.App.2d 17 [202 P.2d 565], discussed the cases and came to the conclusion that an appeal was appropriate from an order pursuant to Probate Code section 1020.1 approving or disapproving an assignment of an interest in an estate. The case relied on the language of Probate Code section 1240 and determined that the effect of an order made pursuant to Probate Code

section 1020.1 was to "decide that the assignee is or is not one of 'the persons to whom distribution should be made' and so falls within the language of section 1240, Probate Code." (*Id.,* at p. 20.)

Subsequent cases appear to have allowed an appeal from an order under Probate Code section 1020.1 without discussion. (*Estate of Simmons, supra,* 217 Cal.App.2d 580; *Estate of Peterson, supra,* 259 Cal.App.2d 492.) The order is appealable.

> 3. There is substantial evidence to uphold the court's determination that the assignment was not fraudulent.

In the probate court appellant Connie Marks argued that the assignment between Dr. Cook and Chase Manhattan Bank was void as to her because it was made with intent to defraud her as a creditor. Appellant particularly relied on a section in the Uniform Fraudulent Conveyance Act adopted in both New York and California: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors is fraudulent as to both present and future creditors." (Civ. Code, § 3439.07; N. Y. Debtor & Creditor Law (McKinney's Consol.) § 276.)

Appellant admits that not only must the assignor have fraudulent intent but the assignee must also participate in or have knowledge of the fraud. (Civ. Code, § 3439.09; N. Y. Debtor & Creditor Law (McKinney's Consol.) § 278.) Appellant accordingly introduced evidence below to support her burden of proof on the issue of fraud. The evidence, at best, was of a circumstantial nature.

The evidence tended to indicate that Dr. Cook was in arrears in support and alimony payments by over $36,000. Dr. Cook requested a loan from the bank and had assigned away his share in the estate within about six weeks of learning about the legacy. In the loan applications submitted by Dr. Cook he failed to list the long-ignored support obligation as a liability and failed to inform the bank of his obligation to his previous wife. Dr. Cook obtained the loan partly for use as a down payment on a new home but the title to the residence is in the name of his wife.

The allegedly suspicious circumstances surrounding the bank's participation in the loan include the fact that the bank makes a concerted effort

to help the executive officers of the New York Life Insurance Company, a large bank customer. Dr. Cook is an assistant medical director of New York Life. The only evidence of any investigation by the bank into Dr. Cook's credit appeared to be a search of the Uniform Commercial Code filings in the New York county where he lived. Appellant argued that the failure of the bank to investigate more fully into Dr. Cook's financial affairs should result in its being charged with constructive notice of appellant's support judgment against Dr. Cook.

The probate court rejected appellant's contentions, finding that appellant had failed to show the assignment was fraudulent on the part of either Dr. Cook or the bank or that the bank should have known of any fraud.

On appeal the appellant has largely reargued the same evidence presented below. Appellant draws inferences from circumstantial evidence and argues them as facts. Appellant has a greater burden on appeal than she had at trial and she has failed to meet the burden in both cases.

The presence or absence of fraud in a transaction is a question of fact reserved for the trial court. If any substantial evidence exists to uphold the lower court's determination, the judgment must be affirmed. (*Hansford* v. *Lassar* (1975) 53 Cal.App.3d 364, 377 [125 Cal.Rptr. 804]; *Estate of McPherson* (1949) 94 Cal.App.2d 906 [212 P.2d 41].)

"In weighing these claims we must view the evidence in the most favorable light to support the probate court's findings drawing every reasonable inference in their favor which the evidence will support. Probate Code, section 1020.1, lays the duty of determining . . . whether 'any such assignment, transfer (or) agreement . . . was obtained by duress, fraud or undue influence' upon the probate judge and we cannot substitute our judgment for his on the weight and effect of the evidence." (*Estate of Raphael* (1951) 103 Cal.App.2d 792, 795 [230 P.2d 436].)

4. The court correctly held that the entire amount of the bank's claim had priority over appellant's lien.

The question is whether the bank is secured for the entire amount of Dr. Cook's interest in the estate or whether appellant has priority over those advances made by the bank after appellant obtained

her lien. The evidence shows that the bank advanced $45,000 prior to August 14, 1974, and about $13,000 after August 14, on which date appellant obtained a lien by serving a writ of execution on the probate court. The question of priority is determined by article 9 of the Uniform Commercial Code which deals with secured transactions.

The law of secured transactions is controlling because the bank obtained a security interest in Dr. Cook's legacy by the terms of the assignment: "This assignment is hereby made as collateral security." The type of property involved here is classified as a "general intangible." (Cal. U. Com. Code, § 9106; N. Y. U. Com. Code (McKinney's Consol.) § 9-106.) The bank obtained a security interest in a general intangible. This has significance in the question of which state law is to be applied. California Uniform Commercial Code section 9103, subdivision (3)(b), which is applicable to general intangibles states, "The law (including the conflict of laws rules) of the jurisdiction in which the debtor is located governs the perfection and the effect of perfection or nonperfection of the security interest." New York Uniform Commercial Code section 9-103, subdivision (2), provides: "If the chief place of business of a debtor is in this state, this Article governs the validity and perfection of a security interest . . . with regard to general intangibles . . . . Otherwise, the law (including the conflict of laws rules) of the jurisdiction where such chief place of business is located shall govern." ■ The debtor in this case, Dr. Cook, resides in the State of New York and maintains his chief place of business in that state, so the laws of that state apply to the secured transaction aspect of this case.[1]

Under New York Uniform Commercial Code section 9-301, subdivision (1)(b), a lien creditor has priority over an unperfected security interest. The question of priorities becomes a question of whether the security interest held by the bank was "perfected" with regard to the money advanced to Dr. Cook after appellant obtained her lien. Perfection occurs when the security interest has attached and applicable steps for perfection, usually filing, have occurred. (N. Y. U. Com. Code (McKinney's Consol.) § 9-303.) Under New York law no exemption from filing is provided for a security interest on a general intangi-

---

[1]It is noted that article 9 of the Uniform Commercial Code was revised in 1972. (See U. Com. Code (3 U.L.A.) 1976 Pocket Part, p. 228.) California has adopted the revised version of article 9, effective January 1, 1976 (Stats. 1974, ch. 997), while New York has not. (U. Com. Code, *supra*, p. 229.)

ble.[2] The parties in this case failed to discover the significance of this point and no evidence or argument was presented regarding whether the bank perfected its security interest by filing in the proper place—the New York Department of State and possibly the county where Dr. Cook maintained his place of business. (N. Y. U. Com. Code (McKinney's Consol.) § 9-401, subd. (1)(c).) Thus, appellant has waived any claim that the security interest was not properly filed in New York. The assignment was promptly filed with the probate court in Monterey County.

Attachment occurs when (1) there is agreement that a security interest attach; (2) the debtor has rights in the collateral; and (3) value is given. (N. Y. U. Com. Code (McKinney's Consol.) § 9-204.) There is no argument concerning the first two points, leaving the question of value.

The security agreement at issue here had a "future value" clause which purports to commit the borrower's collateral as security not only for present value given but also in the case of future loans. The issue resolves itself into a question of whether the New York jurisdiction recognizes "future value" as being covered by the earlier security agreement or whether a new security interest arises at the time the value is extended. In the latter case a judgment lien arising after the security agreement and before the future value is given would have priority over the amount of that value.

The support for the argument that future value is protected by the security agreement is found in New York Uniform Commercial Code section 9-204, subdivision (5), which provides: "Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment." According to the commentators, this section, while persuasive, is not determinative because it merely allows a future value clause in a security agreement but does not explicitly establish a priority over intervening interests. (N. Y. U. Com. Code (McKinney's Consol.) § 9-204, Practice Commentary, fn. 3; Cal. Commercial Law III (Cont. Ed. Bar) § 4.49.)

The opposing argument relies on the basic definition of a security interest which is "an interest in personal property or fixtures which

---

[2] In California, under former California Uniform Commercial Code section 9302, subdivision (1)(g) a security interest in general intangibles was exempted from filing requirements. Under section 9302, subdivision (1)(c), effective as of January 1, 1976, a security interest created by an assignment of a beneficial interest in a trust or decedent's estate is exempted from filing requirements.

secures payment or performance of an obligation." (N. Y. U. Com. Code (McKinney's Consol.) § 1-201, subd. (37); Cal. U. Com. Code, § 1201, subd. (37).) Under this view no obligation to pay or perform arises until value is advanced and thus no security interest can arise prior to when the creditor advances value. The conflict between the two competing interests is essentially a policy question as to which interest is to have priority over the other.

Prior to the 1972 revision of article 9, the priority problem with which we are concerned was not resolved by the Uniform Commercial Code because the section dealing with priorities was concerned only with priorities among competing security interests and not with other interests such as a lien creditor. (See U. Com. Code (U.L.A.) § 9-312; see also, N. Y. U. Com. Code (McKinney's Consol.) § 9-204, Practice Commentary, fn. 3; Cal. Commercial Law III (Cont. Ed. Bar) § 4.49.)[3]

The weight of the arguments and the commentators is on the side of protecting future advances under the original security agreement against intervening creditors. This is in line with the policy of the Uniform Commercial Code to promote security interests in future *goods* such as inventory and accounts receivable. The official comment to Uniform Commercial Code section 9-204, subdivision (5) states: "At common law and under chattel mortgage statutes there seems to have been a vaguely articulated prejudice against future advance agreements. . . . A common limitation was that an interest claimed in collateral existing at the time the security transaction was entered into for advances made thereafter was good only to the extent that the original security agreement specified the amount of such later advances and even the times at which they should be made. In line with the policy of this Article toward after-acquired property interests this subsection validates the future

---

[3]Uniform Commercial Code section 9-301, subdivision (4), of revised article 9, appears to deal with the problem at hand. That subdivision provides: "A person who becomes a lien creditor while a security interest is perfected takes subject to the security interest only to the extent that it secures advances made before he becomes a lien creditor or within 45 days thereafter or made without knowledge of the lien or pursuant to a commitment entered into without knowledge of the lien." Thus under this subdivision a secured creditor may safely make advances for at least 45 days after the lien or until he acquires knowledge of the lien, whichever occurs later. (See, Cal. Commercial Law III Supp. (Cont. Ed. Bar) § 2.46, pp. 110-111; see also, Anderson, Uniform Commercial Code (1970-1974 Cumulative Supp.) § 9-312, p. 1242.) Under this rule the bank would have priority here as the advances were made within the 45-day period. However, as noted above, New York has not adopted the revised article 9.

advance interest, provided only that the obligation be covered by the security agreement."

Future advances were recognized and protected under the pre-code laws of chattel mortgages and pledges in both New York and California. (*Friedlander* v. *Adelphi Mfg. Co., Inc.* (N. Y. Sup. Ct. 1968) 5 U. Com. Code Reporting Service 7; former Cal. U. Com. Code, § 9204, Cal. Code com., point 7.)

The *Friedlander* case, while not authoritative, has a good discussion of the New York law and is on point on the issue presented here. In response to similar facts the court there stated: "The security interest having attached and become perfected with the first advance may thereafter vary as to the amount by partial payment of the loan or by future advances but each act does not create a new separate security interest." (*Friedlander* v. *Adelphi Mfg. Co., Inc., supra,* at p. 10.)

Another persuasive argument is contained in the language of New York Uniform Commercial Code section 9-201 which states that "a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors." ▮ The policy of the Uniform Commercial Code to give effect to the agreement between the parties combined with the approval for future advances expressed in New York Uniform Commercial Code section 9-204, subdivision (5), is persuasive authority for protecting future advances such as occurred in the transactions between Dr. Cook and Chase Manhattan Bank.[4]

Judgment and order affirmed.

Sims, Acting P. J., and Elkington, J., concurred.

---

[4]Two other contentions made by appellant are not significant. Appellant claims that this court should find in her favor because the bank is the real party in interest and it has not appeared in court. Since Dr. Cook is a party to the assignment contract with the bank and would be liable to the bank for thousands of dollars if the assigned money is not paid to the bank, it is apparent that he is a real party in interest also.

Appellant also argues in the reply brief for the first time that this court should remand the case to the probate court for the taking of further evidence to determine whether the bank is still owed any money or has released Dr. Cook from the assignment. Appellant cites no authority for this request and this contention is without merit.